BROWN & ROOT, INC., Petitioner,

v.

Raymond J. DONOVAN, Secretary of
Labor, Respondent.

No. 83–4486.

United States Court of Appeals,
Fifth Circuit.

Dec. 10, 1984.

Bishop, Liberman, Cook, Purcell & Reynolds, Richard K. Walker, Frederick J. Killion, Washington, D.C., for petitioner.

John Clewett, Washington, D.C., for amicus curiae, Gov. Accountability Project of the Institute for Policy Studies.

T. Timothy Ryan, Jr., Sol. of Labor, Francis X. Lilly, Donald S. Shire, Janet R. Dunlop, U.S. Dept. of Labor, J. Michael O'Neill, Office of the Solicitor, U.S. Dept. of Labor, Washington, D.C., for respondent.

Kenneth J. Mighell, R. Brent Cooper, Dallas, Tex., for amicus curiae Charles A. Atchison.

Before GARZA, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The petitioner, Brown & Root, Inc., appeals the order of the Secretary of Labor (Secretary) affirming an administrative law judge's finding that it discriminated against an employee by discharging him for engaging in conduct protected by section 210(a) of the Energy Reorganization Act (ERA), 42 U.S.C. § 5851(a). Because we find the filing of such a report is not protected by the statute, the Secretary's order is vacated and the case is remanded for further consideration not inconsistent with our holding here.

I.

Brown & Root was the prime contractor at the Comanche Peak Steam Electric Pow-

er Station, a nuclear generating facility near Glen Rose, Texas. In December 1981, Charles Atchison became a field quality control inspector for Brown & Root at the Comanche Peak site. It was the duty of a quality control inspector to issue a nonconformance report (NCR) whenever he detected a condition which he considered did not meet contract specifications.[1] Atchison was specifically responsible for inspecting pipe-whip-restraint-installation welds. The controversy in this case centers on three NCRs issued by Atchison. The first, "the 822 level incident," concerned defects noticed in March of 1982 by Atchison in welds which were not his specific responsibility but which were located near those he was inspecting. After this incident, Atchison's immediate superior informed him that Brandt, the ultimate superior, thought Atchison was inspecting beyond the scope of his job. The area was later reinspected and the existence of some of the defects that Atchison had reported was confirmed.

The second incident, "NCR No. 296," also occurred in March 1982, after a craft supervisor asked Atchison to inspect some welds on uninstalled pipe-whip restraints that the craft supervisor believed to be defective. Four men were assigned to map the defects in the pipe-whip restraints. Brandt was not satisfied with the team's first report, feeling that it showed an impossible number of defects. Atchison was removed from the team and the defects were remapped, but Brandt still considered the number of defects excessive. It was later discovered that Brandt had ordered the wrong standard used in the inspection.

The third NCR, No. 361, drafted by Atchison in April 1982, contended that certain inspection tests conducted by inspectors employed by Texas Utility Generating Company, the owner of the Comanche Peak installation, were invalid because the inspectors were not properly qualified. A draft of this NCR was left on a superior's desk with a note that the NCR had not yet been issued and that Atchison was agreeable to discussing it. Several days later the superior told Atchison that he intended recommending the voiding of NCR No. 361, and Atchison voiced no objection. The NCR, with Atchison's note attached, was given to Brandt along with other papers, including the superior's promotion recommendation for Atchison. Brandt and Purdy, another superior, testified that they interpreted the note on the NCR as an attempt to gain leverage or negotiate with regard to the recommended promotion. On April 12, 1982, Brandt sent Purdy a memorandum stating that Atchison's services were no longer required because "he refuses to limit his scope of responsibility." Purdy testified that because he was unable to place Atchison in another job, he fired him.

Atchison made a timely complaint that he was discharged for activity protected under section 5851(a).[2] The Department of Labor

1. An NCR is a "routine internal report" by which a field quality control inspector notes a condition that either appears not to conform to applicable construction specifications or to which specifications the fact of degree of conformance is indeterminant. The procedures require the inspector who observes such a condition to (1) attach a "hold" tag to prevent further work; (2) obtain an NCR number from the NCR coordinator; (3) enter the NCR number of the hold-tag; (4) draft an NCR describing the condition and mapping its location; and (5) submit the draft NCR for approval to the quality control supervisor.

2. Section 5851(a) provides:
No employer, including a Commission licensee, an applicant for a Commission license, or a contractor or a subcontractor of a Commission licensee or applicant, may dis-

charge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)—
(1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter of the Atomic Energy Act of 1954, as amended [42 U.S.C. 2011 et seq.], or a proceeding for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended;
(2) testified or is about to testify in any such proceeding or;
(3) assisted or participated or is about to assist or participate in any manner in such

investigated and agreed.[3] The administrative law judge found that Atchison had lied on his job application, falsified documents, was a totally unreliable witness and that nothing he said could be believed without independent corroboration. She held with Atchison, however, that filing an NCR was a protected activity, that Atchison was fired for filing the NCRs in "good faith," and that the reasons given by Brown & Root for the discharge were pretexts.[4] The administrative law judge recommended reinstatement, back pay, and attorney's fees. The Secretary of Labor affirmed the administrative law judge's decision with the exception of the reinstatement which was denied because Atchison had falsified his educational qualifications for this critical job on several occasions.

## II.

The dispute in this case concerns whether under 42 U.S.C. § 5851(a)(3) an employer is barred from discriminating against any employee for the filing of an intracorporate quality control report. We hold that the filing of such a report is not protected by the statute. This decision is predicated on three considerations: first, the statutory language cannot be stretched to encompass such a filing. Second, the legislative history of the Energy Reorganization Act (ERA) does not support such an extension of the meaning of section 5851. Third, the structure of the ERA indicates that section 5851(a) is designed solely to protect from retaliation corporate "whistle blowers" who inform responsible officials of corporate failings.

> a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended [42 U.S.C. 2011 et seq.].

**3.** Pursuant to 29 C.F.R. §§ 24.1–24.9 and 42 U.S.C. § 5851(b).

**4.** At the hearing before the administrative law judge, counsel for Atchison expressly stated that

## III.

### A.

The language of section 5851 cannot be construed to protect the filing of purely internal quality control reports. The relevant language prohibits employer discrimination against an employee who has:

> (1) commenced ... a proceeding under this chapter or the Atomic Energy Act of 1954 [together referred to below as "The Acts"] ... or ... for the administration or enforcement of the requirements of ... [the Acts].
> (2) testified ... in any such proceeding
> (3) assisted or participated ... in any manner in such a proceeding or in any other action to carry out the purposes of ... [the Acts].

42 U.S.C. § 5851(a).

The Secretary does not contend that the filing of an internal quality report could be either a "proceeding under" the Acts or a "proceeding for the administration or enforcement of" the Acts; "proceeding" concededly refers to a formal legal or administrative proceeding as the term is used in section 5851. Thus, the act of filing must be participation "in any other action to carry out the purposes of" the Acts if it is protected conduct. Putting aside for the moment the broader questions of purposes and policies behind section 5851, we first examine what meaning an ordinary reader would give to the language of section 5851. "[I]t should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses...." *Escondido Mutual Water v. La Jolla*, — U.S. ——, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984). Absent a clearly expressed legislative intention to the con-

Atchison was *not* alleging that he had been fired for filing NCRs but rather for threatening to go to the Nuclear Regulatory Commission. No evidence adduced at trial would support an inference that any of the management personnel involved in Atchison's termination were aware of such threats. The ALJ, however, based her decision on her finding that Brown and Root terminated Atchison for filing NCRs.

trary, statutory language must ordinarily be regarded as controlling. *Id.*

Because the general term "in any other action" follows a reference to specific types of proceedings, it is most reasonable to presume that the term "actions" refers to something similar to the specific proceedings mentioned earlier in the sentence. Only exceptionally does a writer use a general term after a list of specifics to mean something wholly unrestrained by the specifics. Although this is merely a common-sense rule for interpreting a sentence, in cases of statutory construction we know the rule as "ejusdem generis." 2A C. Sands, *Sutherland Statutory Construction* § 47.17 at 103–04 (3d Ed.1973) (1983 Supp.).

The Secretary has urged the word "actions" be construed as *any* conduct or act, but such a meaning seems unlikely. First, the Secretary's construction runs against the common-sense rule discussed above. Moreover, the statute protects participation *"in* any other action," which implies an "action" is a kind of structured proceeding in which a person may participate, not just any act a person may perform. The Secretary argues that the proceedings expressly listed exhaust the class of all things similar to these proceedings and therefore maintains that "actions" must be given a meaning beyond this class of similarity. We do not agree that the listed specifics exhaust the class. For example, although we do not decide a matter not before us, it appears that a congressional investigatory proceeding or other official investigations are quite likely "actions" bearing sufficient similarity to "proceedings under" the Acts or "proceedings for the administration or enforcement" of the Acts to warrant protection under section 5851.

Second, the Secretary's interpretation would render much of the language of section 5851 redundant. If the word "actions" has his suggested meaning, then the meaning of the entire section could just as easily have been expressed without mention of any "proceedings" at all. Such a construction seems strained. *Meltzer v. Board of Public Instruction,* 548 F.2d 559 n. 38 (5th Cir.1977).

Third, a statute should be interpreted in its entirety. *See Sutherland* at 37. The language of the remainder of the ERA does not support the Secretary. The word "action" is not used elsewhere in the ERA to mean general conduct. Section 5871(e) begins: "no suit, action *or other proceeding....*" (emphasis added), implying an "action" is a kind of proceeding. Section 5851(e), entitled "Commencement of Action," authorizes the Secretary to file a "civil action" and states: "In actions brought under this subsection...." We usually presume words are used consistently through a statute. *Id.* In summary, it seems highly unlikely that an ordinary writer of English would have used the words of section 5851 to mean what the Secretary says they mean. It is much more likely that "action" is used to mean something similar to formal proceedings under the Acts or for the administration or enforcement of the requirements of the Acts.

### B.

The Secretary claims that his interpretation of section 5851 is entitled to substantial deference as the interpretation given a statute by the agency charged with its administration. *Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897 (5th Cir. 1983) (collecting cites). However, *Avoyelles* cited three factors which influence the degree of deference to be accorded an agency's interpretation: first, the degree of agency expertise necessary to reach the interpretation; second, consistency in length of adherence to the interpretation; and third, the explicitness of the congressional grant of authority to the agency. None of these factors support the Secretary in the present case.

First, the Secretary of Labor does not appear to have great expertise in matters of nuclear safety. *See Ford Motor Credit v. Milhollin,* 444 U.S. 555, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980), *Avoyelles* at 911. While section 5851 concerns employee pro-

tection to some extent and the Secretary is charged generally with matters concerning the employee-employer relationship, we cannot ignore the fact that section 5851 is primarily designed to serve the major purposes of the ERA, in this case, nuclear safety. Nuclear energy involves questions of great scientific and engineering sophistication well beyond that required in ordinary industrial relations. The Department of Energy (in particular, the Nuclear Regulatory Commission) has special competence in this area, not the Department of Labor.

Second, the length of time in which the Secretary has adhered to his interpretation of the statute is not great. Under *Avoyelles* the Secretary's opinion, especially if left undisturbed by Congress, is to be taken as evidence of congressional meaning, but "[t]here is no reason to expect administrative agency members ... to display a special fidelity to the original intent of the legislation rather than the current policies of the Administration and the Congress.... If the interpretation has persisted through several changes of Administration, that may be a different matter." Posner, *Statutory Interpretation*, 50 U.Chi.L.Rev. 800, 811 (1983), *Quarles v. St. Clair*, 711 F.2d 691, 706 (5th Cir.1983). Since the amendments under which the Secretary claims authority only date to 1979, this factor does not weigh heavily in his favor.

Third, as we have pointed out above, the language of section 5851 does not appear, explicitly or implicitly, to protect the filing of internal reports; quite the reverse is true. The Secretary's reliance on *Avoyelles* is unwarranted; we will not apply the rule of that case in disregard of the policies on which the rule is grounded. "[A]n agency's interpretation cannot be sustained if ... it conflicts with the clear language and legislative history of the statute." *Escondido* at 2114, n. 22.

## IV.

### A.

The legislative history of section 5851 strongly supports interpretating an "ac-

tion" as similar to formal proceedings under or to administer or enforce the requirements of the Acts. The Conference Committee report described the purposes of the section as follows:

> The Senate Bill amended the Energy Reorganization Act of 1974 to provide protection to employees of Commission licensees, applicants, contractors, or subcontractors from discharges or discrimination for taking part or assisting *in administrative or legal proceedings of the [Nuclear Regulatory] Commission.* The House amendment contained no similar provision, and the conferees agreed to the Senate provision.

H.R.Rep. No. 1796, 95th Cong., 2d Sess. 16–17 (1978), U.S.Code Cong. & Admin. News, 1978, pp. 7303, 7309 (emphasis added).

The Report of the Senate Committee on Environment and Public Workers is to similar effect: "This section offers protection to employees who believe they have been fired or discriminated against as a result of the fact that they have *testified, given evidence, or brought suit under ... [the Acts].*" S.Rep. No. 848, 95th Cong., 2d Sess. 29 (1978), U.S.Code Cong. & Admin. News 1978, p. 7303 (emphasis added).

In rebuttal, the Secretary draws attention to the statement of a sponsor of the legislation: "Let me point out that the protection afforded is intended to apply, even if no formal proceeding is actually instituted as a result of the employee's assistance or participation." Statement of Sen. Gary Hart, 124 Cong.Rec. 29771 (1978).

However, the statements of individual legislators, even sponsors, are much less conclusive on the issue of congressional intent than are official committee reports, and, in addition, Senator Hart's statement is not inconsistent with our reading of the statute. We read section 5851 as requiring an "action" to be similar to the proceedings expressly described in that section. We do not now consider what degree of *formality* an "action" must have under that section, and this appears to be the only matter addressed by the Senator's statement.

### B.

Attempts to analogize section 5851 to portions of the National Labor Relations Act and the Federal Mine Safety Act are not persuasive. The Secretary relies on a statement in a Senate Report to the effect that section 5851 is substantially identical to provisions of the Clean Air Act and Federal Water Pollution Control Act, which, the Secretary argues, were patterned on provisions of the Mine Safety Act [MSA]. S.Rep. No. 848, 95th Cong., 2d Sess. 29 (1978). However, the MSA, which was amended only one year before the ERA, contains language *expressly* protecting employees filing internal complaints:

> No person shall discharge or in any way discriminate against ... any miner ... because such miner ... has filed or made a complaint under or relating to this chapter, including a complaint notifying the operator or the operator's agent, ... of an alleged danger or safety or health violation in a ... mine....

30 U.S.C. § 815(c)(1), *amended by* Pub.L. 95–164, Title II § 201, Nov. 9, 1977, 91 Stat. 1303.

The ERA has no such express language. By the absence of this language it may be as convincingly argued that in drafting the ERA Congress intended to deny protection to the filer of an internal report. Comparisons with the MSA do not seem to be helpful in this case.

The Secretary also relies on a case decided under the National Labor Relations Act (NLRA), *NLRB v. Scrivener,* 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972). However, *Scrivener,* in which an employee gave written, sworn statements to an NLRB field examiner, is not particularly helpful in the present case, which involves the filing of a purely internal report. First, the NLRA expressly prohibits discrimination against employees who have "given testimony under this Act." It does no violence to the language of the NLRA to interpret signed, sworn statements as "testimony." Second, the Secretary strenuously argues that the *Scrivener* decision is especially applicable to this case because *Scrivener*

was predicated to some extent on the possibility that failure to protect employee contacts with NLRB agents might "dry up" the NLRB sources of information and thus undermine the regulatory structure Congress had put in place. In *Scrivener,* however, the government's ability to obtain necessary information would have been directly impaired if the Board's own agents could not have contacted an employee without the employee fearing retaliation; here, any effect on the government's ability to obtain information will be at most indirectly impaired if the filing of purely internal reports, not directed to the competent agency, is left unprotected. There may be some such remote effect, and this might by some be counted a cost of our decision, but an extension of regulation would itself bring a burden of increased interference with internal procedures, not intended by Congress.

The Secretary's argument that there would be benefits from increased regulation under section 5851 is not so clear as to persuade us against the weight of the ERA's language that the words of Congress mean what the Secretary says they mean. In the present case, for example, the administrative law judge found that the employee falsified his qualifications in his job application and other records; the judge decided that testimony provided by the employee was so untrustworthy that it could only be considered if it were substantiated by evidence over which the employee had no control. Nevertheless, the judge found the employee had filed his quality control reports in "good faith." This example indicates that interference with employee-employer relationships would be quite substantial if the Secretary's interpretation were adopted.

### V.

### A.

The structure of the ERA indicates that section 5851 is designed to protect "whistle blowers" who provide information to gov-

ernmental entities, not to the employer corporation.

Subchapter II of the ERA sets up the structure by which Congress intended the safety of nuclear installations to be assured. The subchapter creates the NRC and its various constituent monitoring, research and enforcement agencies. ERA, 42 U.S.C. §§ 5841–45, 5847–50. The officers of these agencies are charged with the investigation of nuclear facilities. Correspondingly, nuclear corporations and corporate officers are charged with ensuring that safety violations are reported and that regulations are enforced under section 5846. Officers failing to report violations are subject to civil penalties. Thus, the basic structure of the ERA is not designed to modify the employee-employer relationship, but rather to rely on corporate officers to manage the corporation in compliance with their obligations to ensure public safety.

The role of section 5851 in this legislative framework is clear: to protect the integrity of the regulatory structure and to guard against the possibility that corporate officers will not provide the necessary information, section 5851 protects employees who provide competent government officials with direct information. Thus, section 5851 protects corporate "whistle blowers." If a corporate officer fails to act on an *internal* report critical of safety conditions, he is liable under section 5846. While an individual employee disciplined for the filing of an internal report is not entitled to redress under section 5846, any officer responsible for the discipline must bear in mind that he will be subject to sanction. Thus, the overall plan of the ERA is to maintain public safety not restructure the employee-employer relationship.

In this regard we are troubled by the Secretary's inability to confine in a principled way the logical consequences of his proposed interpretation; these consequences would seem to extend far beyond the purpose and structure of the ERA. If, as the Secretary maintains, all conduct of a quality control inspector believing he is helping to ensure the safety of a nuclear plant is protected by section 5851, then the same would appear to be true of all engineers and architects who work on the design of the plant. The Secretary's reading of the statute would appear to prohibit the discipline or discharge of such people for any disagreement with their employers on any matters which involve plant safety. Moreover, the same would appear to be true for *every employee.* Since a wide range of decisions in a nuclear company will have *some* bearing on plant safety, the Secretary asks us to adopt an interpretation that would radically restructure the employee-employer relationship in all nuclear corporations on the basis of a general "catch all" provision attached to the end of a statute. If the statutory languages were not enough to persuade us that the Secretary's interpretation is incorrect, these limitless consequences would certainly give us pause.

### B.

The fact that Congress has laid down, or caused to be laid down, more refined and express regulations concerning the nuclear industry than any other industry in the nation, cautions us against extending this regulatory scheme by implying protection of internal filings where none exists expressly. The fact that Congress has produced so many detailed provisions governing the nuclear industry indicates the legislature may well have attempted to approach the line where it believed the added costs of regulation exceed benefits. *Edgar v. MITE,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (holding that additional protection afforded investors by state securities statutes would "overprotect" investors to their detriment); *see* Easterbrook, *Statutes' Domain,* 50 U.Chi.L.Rev. 533, 542 (1983). If this is so, for a court to interpret the statute to authorize "more in the same vein" will result in regulation where costs exceed benefits, upsetting the balance intended by Congress. *Id.* We believe that respect for the detailed ex-

press regulatory structure set up by Congress counsels us to take a cautious approach in interpreting the general phrase "any other action to carry out the purposes of" the Acts. This caution is an additional reason for interpreting the general term "action" as denoting something closely similar to the "proceedings" expressly mentioned in section 5851.

## VI.

We accordingly hold that employee conduct which does not involve the employee's contact or involvement with a competent organ of government is not protected under section 5851. We do not purport to *define* what constitutes protected conduct under section 5851; such a determination is unnecessary to the resolution of this case. We do not say that an employee states a claim under section 5851 if he merely alleges employer discrimination on the basis of employee contact or involvement with a competent organ of government; however, absent such contact or involvement, the employee does not make out a claim under this section. We do not attempt to say what protected conduct under section 5851 *is;* we indicate only what it *is not.* Since the filings in this case were purely internal, we hold they were not within the scope of section 5851.

## VII.

We are, of course, mindful that our holding in this case creates a split in the circuits. The Ninth Circuit has previously held that the filing of internal quality control reports is protected by section 5851. *Mackowiak v. University,* 735 F.2d 1159 (9th Cir.1984). *Mackowiak*'s holding on this issue is predicated primarily on what the Ninth Circuit perceived as similarities between the provisions of the Mine Safety Act and section 5851. As we have pointed out above, the MSA contains language expressly protecting internal filings. Accordingly, the MSA, in our view, provides no support for *Mackowiak*'s interpretation of section 5851.

*Mackowiak* also finds a rationale for extending protection to internal filings because: "In a real sense, every action by quality control inspectors occurs 'in an NRC proceeding,' because of their duty to enforce NRC regulations." *Mackowiak* at 1163. One major difficulty with this rationale is that there appears to be no support for it in the language, legislative history or structure of the ERA.

Of equal concern to us is the fact that there is no principled way to contain this rationale. The officers of a nuclear corporation and the corporation itself are required by law to enforce NRC regulations. This would imply, under the Ninth Circuit reasoning, that "[i]n a real sense, every action by . . ." nuclear corporations "occurs 'in an NRC proceeding,' because of their duty to enforce NRC regulations," so that *all* employee interactions with the corporation would be protected as participation in an NRC proceeding. This obviously is not the meaning of section 5851 and neither the Secretary nor the Ninth Circuit has suggested any satisfactory way in which this rationale might be contained. *Mackowiak* suggests that it only forbids the discharge of quality control inspectors "because they do their job too well." *Id.* The restriction of the holding to quality control inspectors appears to be unsupported by the language or structure of the statute. "This effort to circumvent the plain meaning of the statute by creating ambiguity where none exists is unpersuasive." *Escondido* at 2115 (discussing the statutory interpretation in *Escondido Mutual Water v. LaJolla,* 692 F.2d 1223 (9th Cir.1983).

The Second Circuit has also applied section 5851 to the filing of internal quality reports. *Consolidated Edison v. Donovan,* 673 F.2d 61 (2d Cir.1982). However, neither party challenged this application and there is certainly no discussion of the issue in that case. We believe that had the matter been argued, the outcome of that case might well have been different.

## VIII.

In this opinion we have concluded that the Secretary's interpretation of section

5851 is unsupported by the language, legislative history, structure or purposes of the ERA. We find that Atchison's conduct was not protected under section 5851 and accordingly vacate the Secretary's order and remand the matter for further consideration not inconsistent with our holding here.

VACATED and REMANDED.