United States Court of Appeals,

Eleventh Circuit.

No. 94-4067.

BECHTEL CONSTRUCTION COMPANY, Petitioner,

v.

SECRETARY OF LABOR, Respondent.

April 20, 1995.

Petition for Review of a Final Decision and Order of the Secretary of Labor. (No. 87-ERA-0044).

Before CARNES, Circuit Judge, DYER and GUY[*], Senior Circuit Judges.

RALPH B. GUY, Jr., Senior Circuit Judge:

This is an appeal from the Secretary of Labor's determination that petitioner violated the employee protection provisions of the Energy Reorganization Act, commonly referred to as whistleblower provisions. The provisions prohibit an employer from discharging or otherwise discriminating against any employee who has engaged in protected activities. On appeal, petitioner Bechtel Construction Company (Bechtel) claims that the Secretary of Labor's finding that Bechtel discharged one of its employees for engaging in whistleblower activities is not supported by substantial evidence. Petitioner further claims that the employee's conduct was not protected activity as a matter of law.

Our review of the record convinces us that the Secretary should be affirmed.

I.

Bechtel is a contractor at the Turkey Point Nuclear Power

---

[*]Honorable Ralph B. Guy, Jr., Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

Facility at Florida City, Florida. Turkey Point is owned and operated by the Florida Power and Light Company (FPL), which is licensed to operate the facility by the Nuclear Regulatory Commission (NRC). Bechtel built the plant for FPL and continues to maintain it. The facility is divided into two areas, the radiation control area and the non-radiation area.

Approximately every 18 months the nuclear units at Turkey Point are shut down for refueling, maintenance and general repairs. These periods are called refueling outages, and may last from several weeks to several months depending upon the work required. During these periods of increased maintenance work, Bechtel hires additional workers. In the spring of 1987, during one of these periods, Bechtel needed an additional carpenter crew for work inside the radiation control area (RCA), a large area which includes containment units, buildings, facilities, and grounds. All persons who work in the RCA must attend and pass a three-day course known as Red Badge School, which takes place at the facility and instructs the workers on RCA procedures, including health physics requirements and handling of radiation-contaminated objects.

The RCA is supervised and controlled pursuant to NRC guidelines and regulations. All contemplated work and activity in the RCA is pre-screened by the licensee, FPL, or its contractor, Bechtel, to determine the amount of possible radiation exposure, the necessary protective clothing and the equipment necessary for such work assignments. Each work activity requires a radiation work permit (RWP), which provides and identifies necessary

information.

During the spring 1987 outage Larry Williams, the carpenters' general foreman, decided to form an additional carpenter crew, elevating John Wright as crew foreman. Bechtel staffed the new crew primarily by hiring new workers. Williams, however, wishing to include an experienced, Red Badge-certified carpenter, approached a non-RCA carpenter foreman, Greg Lilge, and asked that Russ Smith, one of Lilge's crewmembers, be transferred to Wright's crew.

Lilge offered Roy Nichols, instead. Except for an eight- to ten-week layoff, Nichols had worked as a non-RCA carpenter for Bechtel for 31 months. For the previous six months, however, Nichols reflected what Lilge described as an attitude problem. A few weeks earlier, Lilge had recommended to Williams that Nichols be laid off in the next reduction in force at the end of the outage. Nonetheless, Williams approached Nichols about this proposed transfer. He told Nichols that Wright's crew needed some experienced carpenters, and that it was "more than likely" that Nichols would return to Lilge's crew when the outage was over. At the hearing, however, Williams admitted that he did not tell Nichols the whole truth, and that he actually believed that all of Wright's crew, including Nichols, would be laid off at the end of the outage. Nichols transferred to Wright's crew in early March 1987. During the first weeks of the outage, the temporary crew worked in non-radioactive areas. Later, however, the crew was assigned to work on a unit that required handling contaminated tools.

When working in radioactive areas, the crew members would change into special clothing at the beginning of their work shift. They would then select tools they needed for the particular task. These previously contaminated tools were stored in a "hot tool box" located in a storage building for radioactive materials. Upon obtaining the tools, a crew member would have the health physics (HP) staff person on duty measure the amount of contamination and write the rate of contamination on a tag attached to the bag containing the tools. The procedure was known as "taking a dose rate and tagging" the tools. The HP technician also would brief the employees on the highly contaminated areas and required safety precautions. He would then give the employee an RWP, listing the equipment and radiological conditions under which the employee would be working. The employee was required to sign the RWP, which indicated agreement to abide by the permit's regulations.

When Wright's crew began working inside the RCA, Nichols and Wright disagreed over the proper procedure for surveying and tagging contaminated tools. Nichols had not previously worked in the RCA, but he had taken five Red Badge courses. Based on his training, Nichols understood that contaminated tools were to be put in two double polyurethane bags and carried to the "frisking station" where the HP technician on duty could take a dose rate and tag them. Wright told Nichols that the tools could be placed in a single bag, and if the HP technician was not at the frisking station, the tools could be taken to the HP technician in the dry storage warehouse for dosing and tagging. Nichols disagreed and stated that he believed safety procedures required that the tools

be surveyed at the tool box.

In general, workers within the RCA differed in opinion as to which procedure was correct. Wright's approach was consistent with the way another crew operated and with the view of some HP staff members. Nichols and some other crew members, however, thought the procedure violated safety requirements. Another crew member on Nichols' crew testified at the administrative hearing regarding Nichols' whistleblower claim that he had made an anonymous complaint to the senior HP supervisor about the practice. Even HP technicians had given conflicting instructions.

Nichols insisted on waiting at the tool box for an HP worker to survey the tools before reporting to the work site, contrary to Wright's instruction. Nichols told his foreman's supervisor, Williams, that he disagreed with the way Wright said to handle the tools. Williams told Nichols he would investigate. Nichols also approached a couple of the HP technicians and the HP supervisor assigned permanently to Turkey Point to discuss this issue.

Ultimately the HP shift supervisor, Donald Hicks, resolved the issue of where to survey and tag tools. The HP supervisor told Wright that Nichols was correct about where the tools had to be surveyed. Wright indicated that he believed that surveying the tools at the tool box caused too much delay. Nevertheless, Wright acceded and told his crew to have their tools surveyed and tagged at the tool box. Hicks also mentioned to Williams and Wright that he had received a complaint about the tool handling situation, but refused to identify the complainant. Wright, however, learned from other crew members that Nichols had complained to Williams about

how the tools were being handled.  Wright confronted Nichols, and advised Nichols to come to him first with any such problems. Nichols reminded Wright that he had already come to him about the issue.

As the outage came to an end in April of 1987, Williams approached Wright and told him that, as part of the reductions in force which had begun earlier that month, Wright should pick one of his carpenters to be laid off.  Wright initially selected a crew member who was absent from work that day.  The next day, however, he told Williams to lay off Nichols.  Williams asked Wright if he was sure.  Wright indicated that he was, and Nichols was laid off.

Within 30 days, Wright's entire crew was laid off.  Wright returned to his carpenter position.  Bechtel did recall some of the temporary employees for additional work;  it never recalled Nichols however.  Nichols became ineligible for rehire sometime in 1988 or 1989 because Bechtel hires its carpenters through the union, and Nichols had stopped paying his union dues.

After he had been laid off, Nichols asked Williams why he had been let go.  Williams indicated that Nichols had always been a good worker, and was laid off at Wright's discretion because Wright believed he could work better with the other carpenters on the crew.

In May 1987, Nichols filed an administrative complaint with the United States Department of Labor (DOL) alleging that Bechtel unlawfully discriminated against him.  He claimed that Bechtel laid him off because he insisted on following safety procedures. Following an investigation, DOL's Wage and Hour Division of the

Employment Standards Administration issued a letter concluding that Bechtel had discriminated against Nichols by terminating his employment at Turkey Point for activities protected by the Energy Reorganization Act of 1974, as amended (the Act or ERA), in violation of 42 U.S.C. § 5851 and implementing regulations thereunder. Bechtel requested a hearing before an administrative law judge (ALJ).

During that hearing, Nichols testified on his own behalf and called three former co-workers. Deposition testimony of the health physics supervisor also was admitted. Bechtel called five of its supervisors, including Wright and Lilge, and four carpenter crew members.

At the hearing, Wright testified that Nichols was slow in getting dressed in the required protective gear and prolonged work by working slowly on some assignments. He further testified that he believed that he could get more work out of the other crew members. Wright did not tell Nichols that his work was too slow, nor did he report his performance to Wright's superiors, except for once mentioning to Williams that Nichols was slow in getting dressed and ready for work in the morning.

Nichols testified that the only time he ever intentionally stretched out a job was when his foreman directed him to do so. Fellow crew members attested to Nichols having performed his work according to procedures and testified that he did not stretch out jobs or fail to get along with his foreman.

One crew member who had worked for Bechtel as a temporary worker during five outages testified that based on his experience

the temporary and less experienced workers were usually laid off ahead of more senior experienced workers. Nichols, however, was the first laid off from Wright's crew, ahead of other less experienced crew members.

Two of Nichols' fellow crew members testified that Wright had directed them to violate established safety procedures.

The ALJ recommended against relief for Nichols. He concluded that Nichols had not engaged in protected activities but, rather, had merely questioned a supervisor about the correct method of handling tools. According to the ALJ, Nichols was "unfamiliar with the procedures" and "wondered" about the proper way to handle the contaminated tools. The ALJ determined that even if Nichols had engaged in protected activity Bechtel's termination of Nichols was not discriminatory, as Nichols was unable to show that protected conduct was a motivating factor in the employer's decision. Bechtel laid off Nichols "in a bona fide force reduction," noting that "Wright's reason for dismissing Nichols did not concern his skills, but his attitude."

On appeal, in 1992, the Secretary of Labor (Secretary) issued a final decision and order concluding that the ALJ's decision was not supported by the evidence. The Secretary found that Nichols had met his prima facie burden for showing that Bechtel had discriminated against him. The Secretary concluded that Nichols' questioning of the tool handling procedures was "tantamount to a complaint that correct safety procedures were not being observed." In referring to the record, the Secretary noted the dispute between Nichols and Wright over proper procedures and Nichols' going to

Wright's supervisor, Williams, about his concerns that the correct procedure was not being followed. The Secretary also found that Bechtel's reasons for Nichols' layoff "were not believable" and that Nichols "sustained the burden of persuasion that the real reason for his selection [to be laid off] was his protected activity." The Secretary ordered that Nichols be reinstated and remanded the case to the ALJ for determination of back pay.

On remand, the ALJ determined that Nichols was not entitled to reinstatement and was due back wages for one month. In reaching this decision, the ALJ reasoned that the entire crew had been laid off within 30 days of Nichols' termination. Although Bechtel might have later recalled Nichols, the ALJ declined to award back pay for such wages because the amount could not be determined with reasonable certainty.

On appeal of the relief determination, the Secretary issued his final decision and order. He accepted the ALJ's recommendation regarding back pay and concluded that Nichols was not entitled to reinstatement. Bechtel appeals.

## II.

### A. Protected Activity

We review questions of law on a de novo basis. *See Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991). Bechtel claims that general inquiries regarding safety do not constitute protected activity. We agree. Our inquiry does not end there, however, as we agree with the Secretary that the record clearly supports that Nichols did not merely make general inquiries regarding safety but, rather, he raised particular, repeated concerns about safety

procedures for handling contaminated tools.  Specifically, Nichols questioned his foreman, Wright, about the correct safety procedure for tool handling.  He also raised the issue with Wright's supervisor.  The Secretary correctly characterizes questioning one's supervisor's instructions on safety procedures as "tantamount to a complaint."

At the time Nichols filed his complaint in 1987, § 210(a) of the ERA prohibited nuclear industry employers from discharging or otherwise discriminating against their employees because the employee:

>    (1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act of 1954, as amended [42 U.S.C.A. § 2011 et seq.], or a proceeding for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended;
>
>    (2) testified or is about to testify in any such proceeding or;
>
>    (3) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended.

42 U.S.C. § 5851(a).  The Act did not define the term "proceeding" or the phrase "any other action to carry out the purposes of this chapter."

Although this circuit has not addressed the scope of protected activity under § 5851(a), numerous other circuits have.  Every circuit, except for the Fifth Circuit, has agreed with the Secretary's interpretation that under circumstances such as these, when an employee makes informal complaints, such acts constitute protected activity.  *See, e.g., Jones v. Tennessee Valley Auth.,*

948 F.2d 258, 264 (6th Cir.1991); *Couty v. Dole,* 886 F.2d 147, 148 (8th Cir.1989); *Kansas Gas & Elec. Co. v. Brock,* 780 F.2d 1505, 1510 (10th Cir.1985), *cert. denied,* 478 U.S. 1011, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986); *Mackowiak v. University Nuclear Sys., Inc.,* 735 F.2d 1159, 1163 (9th Cir.1984); *Consolidated Edison Co. v. Donovan,* 673 F.2d 61 (2d Cir.1982); *but see Brown & Root, Inc. v. Donovan,* 747 F.2d 1029 (5th Cir.1984) (filing of internal safety reports is not protected activity under ERA). Consistent with the majority of circuits that have decided this issue, the Third Circuit held that a similar whistleblower provision of the Clean Water Act (33 U.S.C. § 1251 et seq.) covered internal complaints. *Passaic Valley Sewerage Comm'rs v. DOL,* 992 F.2d 474, 478 (3d Cir.), *cert. denied,* --- U.S. ----, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993).

The Secretary has interpreted the phrase "any other action" under § 5851(a)(3) to extend beyond mere participation in a "proceeding" to include internal complaints made to supervisors and others. *See, e.g., Kansas Gas,* 780 F.2d at 1510; *Mackowiak,* 735 F.2d at 1162. Otherwise, the phrase would be mere surplusage, adding nothing to the protection already granted to participation in "proceedings."

Under *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must defer to an agency's interpretation of a statute committed to it for administration if, absent a clear and unambiguous indication of congressional intent, the agency has construed the statute reasonably. If "Congress has not directly addressed the precise

question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (footnote omitted).

We agree that the statute does not directly address whether internal complaints are protected activity, and therefore we consider whether the Secretary's construction is permissible. The Secretary bases his construction in part on legislative history. For example, the legislative history suggests that Congress was aware at the time the provision was enacted that analogous statutes had been interpreted to include internal complaints. The Senate Report accompanying the bill states that this section is "substantially identical" to provisions in the Clean Air Act and the Federal Water Pollution Control Act, and that these acts were themselves "patterned after the National Labor [Relations] Act and a similar provision in Public Law 91-173 [the Federal Coal Mine Health and Safety Act of 1969]." S.Rep. No. 848, 95th Cong., 2d Sess. 29 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7303. The "similar provision" referred to in the Coal Act had previously been construed to cover a miner's presentation of safety complaints to his employer. *E.g., Phillips v. Interior Bd. of Mine Operations Appeals,* 500 F.2d 772 (D.C.Cir.1974), *cert. denied sub nom., Kentucky Carbon Corp. v. Interior Bd. of Mine Operations Appeals,* 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975). Moreover, the

same Congress that enacted the ERA's whistleblower provisions amended the Coal Act to clarify expressly its approval of the *Phillips* interpretation. S.Rep. No. 181, 95th Cong., 1st Sess. 36 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3436.[1]

Even without *Chevron,* it is appropriate to give a broad construction to remedial statutes such as nondiscrimination provisions in federal labor laws. *See, e.g., Jones v. Metropolitan Atlanta Rapid Transit Auth.,* 681 F.2d 1376, 1380 (11th Cir.1982), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984). The Secretary's interpretation promotes the remedial purposes of the statute and avoids the unwitting consequence of preemptive retaliation, which would allow the whistleblowers to be fired or otherwise discriminated against with impunity for internal complaints before they have a chance to bring them before an appropriate agency. *See, e.g., Macktal v. Secretary of Labor,* 923 F.2d 1150, 1152 (5th Cir.1991). This construction encourages safety concerns to be raised and resolved promptly and at the lowest possible level of bureaucracy, facilitating voluntary compliance with the ERA and avoiding the unnecessary expense and delay of formal investigations and litigation.

We are not convinced otherwise by the *Brown & Root* decision. First, we note that the Fifth Circuit did not mention the Supreme Court's then-recent decision in *Chevron,* relying instead on

---

[1]In 1992, Congress amended the ERA's whistleblower provisions to provide explicitly that an employer may not discriminate against employees for making internal complaints about safety procedures. 42 U.S.C. § 5851(a)(1)(A) and (B). The amendment applies to all complaints filed after the effective date of the statute, October 24, 1992.

pre-*Chevron* principles according less weight to agency interpretations. 747 F.2d at 1032-33. Second, the Fifth Circuit accorded less weight to the Secretary's interpretation in part because "the Secretary of Labor does not appear to have great expertise in matters of nuclear safety." 747 F.2d at 1032. As the Supreme Court has observed more recently, however, "while [ERA's whistleblower provisions] obviously [bear] some relation to the field of nuclear safety, [their] "paramount' purpose was the protection of employees." *English v. General Elec. Co.,* 496 U.S. 72, 83, 110 S.Ct. 2270, 2277, 110 L.Ed.2d 65 (1990). Indeed, Congress entrusted the enforcement and administration of ERA's whistleblower provisions "not to the NRC—the body primarily responsible for nuclear safety regulation—but to the Department of Labor." *Id.* at 83 n. 6, 110 S.Ct. at 2277 n. 6. Therefore the Secretary's expertise in employee protection entitles his view to deference. Moreover, the *Brown & Root* Court ignored relevant legislative history indicating the statutory models upon which ERA was based and instead compared the statute to the Federal Mine Safety and Health Act, enacted in 1977, which expressly protected internal complaints.[2]

B. Substantial Evidence

Given that we find the Secretary correctly determined that Nichols engaged in protected activity, we also must address whether the Secretary properly found that Bechtel had discriminated against

_____

[2]Even Bechtel seems to concede that informal complaints are protected under the Act. It carefully limits its characterization of Nichols' complaint as mere "general questioning." We do not address whether mere general questions regarding safety measures are protected activity under the Act.

him by firing him because of that activity.  A Secretary's findings of fact and credibility choices must be supported by substantial evidence.  *NLRB v. Datapoint Corp.,* 642 F.2d 123, 126 (5th Cir.1981).  We find that there is substantial evidence to support such a determination.  Substantial evidence has been defined as " "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938));  *see also Northport Health Serv., Inc. v. NLRB,* 961 F.2d 1547, 1550 (11th Cir.1992).  As in this case, when there are disagreements between the Secretary and the ALJ involving questions of fact and credibility, the court may examine the evidence more critically in determining whether there is substantial evidence to support the Secretary's decision.  *Syncro Corp. v. NLRB,* 597 F.2d 922, 924-25 (5th Cir.1979).  Under that standard, we are not required to choose between the ALJ's and Secretary's determinations.  Rather, we merely require that the Secretary's choice in adopting two fairly conflicting views, "be supported by articulate, cogent, and reliable analysis." *Northport,* 961 F.2d at 1553-54.[3]

---

[3]The length and complexity of the trial are relevant to the issue of deference due an ALJ.  Bechtel argues that the Secretary's review of the evidence from a cold record cannot compare with the ALJ who "was an impartial and experienced examiner who lived with the case."  Bechtel, who is urging that this court reverse the Secretary's decision in favor of the ALJ's recommendation, erroneously states that the ALJ conducted a hearing "from October 15, 1987 through November 5, 1987."  The record reflects, however, that the hearing lasted for two days, beginning on October 15, and continuing on November 5.

To show discrimination, an employee must establish that (1) the employer is governed by the Act; (2) the employee engaged in protected activity as defined in the Act; and (3) as a result of engaging in such activity, the employee's terms and conditions of employment were adversely affected. 42 U.S.C. § 5851. The Secretary addressed whether Nichols made out a prima facie case, showing (1) the employer is covered by the act, (2) the employee engaged in protected activity, (3) the employee suffered adverse action, and (4) there is an inference of causation between the protected activity and the adverse action. Proximity in time is sufficient to raise an inference of causation. *Couty,* 886 F.2d at 148.

Once an employee has made a prima facie showing, the burden then shifts to the employer to produce evidence that its action was motivated by a legitimate, non-discriminatory reason. Bechtel did this when Wright suggested that Nichols was slow, and had an attitude problem. The burden of production then shifts to the employee to establish that the employer's proffered reason is pretextual by establishing either that the unlawful reason, the protected activity, more likely motivated Bechtel or that the employer's proffered reason is not credible and that the employer discriminated against him. Although the Secretary's decision was issued before the Supreme Court's decision in *St. Mary's Honor Center v. Hicks,* --- U.S. ----, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Secretary determined that Nichols had "sustained the burden of persuasion that the real reason for his selection was his protected activity."

We first address whether Nichols established a prima facie case of discrimination. Bechtel concedes that it is an employer covered under the Act and that Nichols suffered an adverse action in being laid off. As discussed above, we conclude Nichols engaged in protected activity. Since Nichols was terminated shortly after he complained, an inference of causation was permissible.

We next address whether there was substantial evidence to support the Secretary's determination that Nichols rebutted Bechtel's explanation for his termination. Of the witnesses who testified about Nichols' performance in March and April, only Wright and foreman Trantham stated that Nichols was a slow worker who exhibited a poor attitude.

Foreman Trantham, who was not Nichols' foreman, indicated that he observed Nichols working slowly on one occasion. Although he further testified that Nichols was slow to dress in protective gear, he admitted that the dressing area was "tight" and often contained about 50 carpenters at a time and the workers occasionally had to wait for clothing in their size.

Wright's criticism of Nichols was either vague or insignificant. For example, in explaining why he retracted one crew member's name in favor of Nichols' when asked for a candidate for a layoff he stated: "Nichols was slowing down the work.... The way he was doing it, it just didn't—I wasn't pleased." The examples of problems with Nichols' job performance, all of which supposedly related to his being slow, are not worthy of credit. In one example, Wright testified that he told Nichols' partner that a scaffold needed to be completed that day, but that the partner

later told Wright that Nichols said they should take the day to tear the scaffold down. Wright further testified that on another occasion it took Nichols eight hours to perform an assignment that should have taken "half-a-day." Wright also mentioned having to reassign an asbestos removal task because Nichols insisted on wearing a respirator while performing the work. Regarding the scaffolding incident, the record does not establish that Nichols ever knew of the one-day deadline which he exceeded. The half-day assignment was prolonged in part due to delay caused by waiting for an available respirator to perform the task. Relative to the reassignment, Wright did not explain what Nichols had done wrong. If Nichols' concerns involved safety matters, the reassignment would not weigh legitimately against him.

Wright did not discuss Nichols' slow work with him or with Wright's superiors, except for once mentioning to Williams that Nichols was slow to begin working in the morning. Delay by Nichols in getting to the work site was at least in part attributable to safety procedures, which required the surveying of tools, and at times entailed waiting for an HP worker to come to the tool box.

In support of Nichols, three fellow crew members testified that Nichols was diligent, did not work slowly, and did not demonstrate attitude problems about his work or supervisors. The Secretary found that their testimony undermined the ALJ's finding that Nichols did not get along with carpenters in Wright's crew, since three of the six other carpenters in the crew indicated that they did get along with Nichols.

We also find substantial evidence to support the Secretary's

conclusion that the record contained unconvincing evidence of Nichols' poor work attitude. In this case, the witnesses agreed that Nichols got along with his superiors. Wright said that he had no problems getting along with Nichols as a person. Foreman Trantham said that the carpenters in Wright's crew "were good friends to [Nichols]."

The pretextual nature of Bechtel's terminating Nichols is further demonstrated by Bechtel's shifting explanations for its actions. During the proceeding, the ALJ asked Bechtel whether Nichols' job performance or medical condition of arthritis were issues in the case. Bechtel indicated that they were not, attributing his dismissal rather to his attitude, his "gung ho nature."

Yet, on appeal, petitioner's argument is cast entirely as if the layoff was due to poor job performance, exacerbated by Nichols' arthritic condition. On appeal Bechtel argues that it laid off Nichols before any other crew members because "his job performance paled in comparison to the other crew members." Given that, on the record, Bechtel has indicated that these issues were not factors in Nichols' termination, we will not now consider them.

We next consider whether substantial evidence exists to support the Secretary's conclusion that Nichols' actions regarding safety procedures were the motivating factor in laying off Nichols. The ALJ's characterization of the tool procedure dispute as "minor" is undermined by the record which shows that Wright was preoccupied with getting work started quickly at the expense of proper safety procedures. The importance of this issue to Wright is corroborated

by the testimony of two of Nichols' fellow crew members who also had difficulties with Wright over delays caused by adhering to safety procedures. Wright himself admitted that he was "a little upset" at Nichols' having raised the issue about tool safety procedures with Wright's superior.

The Secretary, having considered the record, concluded that Nichols satisfied the burden of persuasion in establishing that the real reason for his being laid off was his having engaged in protected activity. The Supreme Court held in *St. Mary's* that rejection of defendant's proffered reason for taking an adverse action does not compel judgment for the plaintiff, however, the Court also stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is required...."

*Id.* at ----, 113 S.Ct. at 2749 (footnote omitted) (quoting *Hicks v. St. Mary's Honor Center,* 970 F.2d 487, 493 (8th Cir.1992)).

Although *St. Mary's* had not been decided at the time the Secretary rendered the decision on liability in this case, we find nevertheless that the decision is consistent with the Supreme Court's opinion. The Secretary specifically held that Nichols "sustained the burden of persuasion that the real reason for his selection was his protected activity," based on the record

discussed above.[4]

     AFFIRMED.

---

[4]Bechtel argues that the Secretary's determination that the remedy of reinstatement is not appropriate in this case as somehow supporting its contention that the Secretary's liability determination is in error.  The determinations are not inconsistent.  The Secretary, determining relief, relied on uncontroverted testimony by Nichols former foreman, Lilge, that he thought Nichols for the past six months that he had worked for him had an attitude problem and because of that he would not have wanted Nichols back after his layoff from Wright's temporary crew.  The Secretary, in disposing of the liability issue, found that Lilge's opinion of Nichols, however, had no relevance as to why Wright, Nichols temporary foreman, chose to lay off Nichols.  There is no suggestion on appeal that Lilge's opinion was a factor in Wright's decision to lay off Nichols.  Lilge's uncontroverted testimony regarding his opinion of Nichols as a worker therefore was rejected for purposes of liability but was relied on as relevant testimony for the separate issue of relief.