USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-1245 STEPHEN R. MARQUES, Plaintiff, Appellant, v. KEVIN J. FITZGERALD, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ernest C. Torres, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Tauro,* District Judge. ______________ ____________________ Thomas S. Brown with whom Stephen A. Rodio was on brief for _______________ ________________ appellant. Kathleen M. Powers with whom Marc DeSisto was on brief for __________________ ____________ appellee. ____________________ October 28, 1996 ____________________  ____________________ *Of the District of Massachusetts, sitting by designation. COFFIN, Senior Circuit Judge. This case concerns several _____________________ claims brought by plaintiff-appellant, Stephen R. Marques, against the city of East Providence, Rhode Island, based on his discharge while a probationary employee of the city. Marques, who had refused to continue a work assignment on a boat at a city pond due to his fear of capsizing and was subsequently terminated, sued the city under both state and federal law; the city removed the case to federal court. The district court granted directed verdicts for the city on all claims. We affirm on two claims, and vacate as to Marques' claim under the Rhode Island Whistleblowers' Act.  BACKGROUND Marques was hired as a laborer by the city of East Providence in June 1993.1 On December 22, 1993, several days before the expiration of his six-month probationary period, Marques was assigned to work at Jones Pond, cutting weeds in the pond from an aluminum row boat. Marques, who is unable to swim, expressed some concerns about the assignment to Gregory Gammell ("Gammell"), the Superintendent of the Parks Department, but was told by Gammell not to worry about it. On his arrival at Jones Pond, Marques noticed that there were no life preservers in the boat, and asked Gammell for one. Gammell initially questioned Marques' need for the life preserver, but told him he would get  ____________________ 1 We take the facts from the pleadings and from the testimony at trial. See PHC, Inc. v. Pioneer Healthcare, Inc., ___ _________ _________________________ 75 F.3d 75, 77 (1st Cir. 1996). -2- one; however, this life preserver was not forthcoming.2 Marques nevertheless performed the assignment. On the following day, December 23, 1993, Marques, who had again been assigned to duty in the boat cutting reeds, told lead worker Robert Barlow ("Barlow") that he was nervous about working in the boat, that he would like a life preserver, and that he had asked for one on the prior day but not received it. Barlow questioned the need for a life preserver, given the depth of the water, but said he would call Gammell. Gammell arrived, but sans life preserver, and subsequently left the site. Marques testified that he began to feel nauseous during the morning while working on the boat, which he attributed to motion sickness. At the morning break, he therefore told Barlow that he wasn't going back in the boat because he was feeling sick. Barlow indicated that if Marques didn't return to the boat, Barlow would call Gammell. During subsequent general conversation between workers at the pond site about the safety of the project, Marques and others expressed concerns about the lack of life preservers and other safety devices. Gammell returned to the pond, and  ____________________ 2 Testimony was presented by city witnesses at trial indicating that the depth of Jones Pond varied between two and five feet. The Pond was created artificially by dredging, and measures approximately 300 feet by 250 feet, with retaining cement walls. We also note that Paul Lemont, the City Manager of East Providence, who gave the original order for the work project at Jones Pond, testified that the weed cutting project could have been performed by laborers in a boat, as actually occurred, or alternatively by laborers wearing boots.  On the other hand, Marques testified that at one point during the December 23rd session, he lost hold of a five foot rake he was using; when he grabbed it, the rake was almost fully submerged in the water, and had not yet touched bottom.  -3- instructed Marques and Barlow to get in his car. On their arrival at Gammell's office, Gammell instructed Marques to "punch out" and then terminated him.3 Marques did not discuss his safety concerns with Gammell during the car trip or at his termination. Gammell informed Marques that he was being terminated because he wouldn't get back in the boat and because of his attitude.  Marques subsequently met with City Manager Lemont to discuss his firing. At this meeting, Marques explained his concerns about safety and his physical ills to Lemont; however, Lemont later wrote Marques a letter informing him that the decision to terminate Marques would stand. Shortly after his termination, Marques began experiencing physical symptoms such as tightness in his chest and difficulty breathing, which his physician attributed to situational anxiety brought on by his firing. His doctor prescribed medications and counseling. Marques also began experiencing marital difficulties.  Marques sued the city in state court, alleging violations of a number of state statutes, including the Rhode Island Whistleblowers' Act, as well as federal claims including the Americans with Disabilities Act. He also claimed that the city's actions constituted negligent or intentional infliction of emotional distress, and that the city had violated the Rhode  ____________________ 3 During the probationary period, city employees could be fired for any reason, with or without cause, and also could not file a grievance with the city regarding a discharge. -4- Island Regulation of Boats law.4 The city removed the case to federal court on the basis of federal question jurisdiction. At the close of the evidence, the district court granted a directed verdict for the city on all counts.5 This appeal on three of the claims followed.  DISCUSSION Our review of the directed verdicts on the appealed claims is plenary; as such we must apply the same criteria used by the district court, with all proof and inferences reasonably drawn therefrom viewed in the light most favorable to the non-movant.  Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994). To ______ ________________ affirm, we must find that the evidence on each count would permit thoughtful factfinders to reach but one conclusion. Fashion _______ House v. K Mart Corp., 892 F.2d 1076, 1088 (1st Cir. 1989).  _____ ____________ After a thorough review of the record, we affirm the district court on the intentional infliction of emotional distress and  ____________________ 4 The specific statutes under which Marques' claims were brought are as follows: the Rhode Island Whistleblowers' Act (R.I. Gen. Laws 28-50-1 - 9); the Americans With Disabilities Act (on the grounds that the city saw him as disabled) (42 U.S.C. 12100 et seq.); the Rhode Island Fair Employment Practices Act (R.I. Gen. Laws 28-50-1 - 28-50-9); the Rhode Island Civil Rights Act (R.I. Gen. Laws 42-112-1 et seq.); and Rhode Island's Regulation of Boats law (R.I. Gen. Laws 46-22-1 - 19). 5 Marques voluntarily dismissed a claim that the city's actions violated Rhode Island's safe boating practices public policy. After the trial court had granted directed verdicts on all the other claims, Marques moved to reinstate this count; however, the district court denied this motion. We need not address this issue because appellant did not brief it. See ___ Playboy Enterprises, Inc. v. Public Service Com'n of Puerto Rico, _________________________ ___________________________________ 906 F.2d 25, 40 (1990) (appellant waives any issue not adequately raised in initial brief). -5- Rhode Island Regulation of Boats claims, but vacate on the appellant's claim under the Rhode Island Whistleblowers' Act. We deal first with the most significant claim. A. Rhode Island Whistleblowers' Act Claim ______________________________________ The Rhode Island Whistleblowers' Act provides in relevant part that: An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, location, or privileges of employment (1) because the employee [...] reports or is about to report to a public body, verbally or in writing, a violation which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation, or rule promulgated under the law of this state, a political subdivision of this state, or the United States, unless the employee knows or has reason to know that the report is false....6 Accordingly, an employee must demonstrate that there was a causal connection between the report and the termination. The statute does not explicitly define what constitutes a "report" or "reporting" a suspected or known violation. However, it does define "public body" as follows: (4) "Public body" means all of the following:[...] (iii) A county, city, town, or regional governing body, a council, school district, or a board, department, commission, agency, or any member or employee thereof.7  ____________________ 6 R.I. Gen. Laws 28-50-3(1) (1995). The current Rhode Island Whistleblowers' Act was enacted in 1995, and replaced an earlier version of the Whistleblowers' Act that carried a different statutory number, (R.I. Gen. Laws 36-15-1 - 10); however, the terms of this section were unchanged.  7 R.I. Gen. Laws 28-50-2(4)(iii) (1995). -6- The district court concluded that this statute is inapplicable in the circumstances of this case because Marques' statements could not be construed as "reports" to a "public body." The district court reasoned that the statute contemplates a situation in which an employee reports or threatens to report a violation of a law to a third party with jurisdiction over the violation. For the district court, Marques' statements were merely explanations for his refusal to return to the boat, rather than reports to an appropriate individual or body of known or suspected violations.  Marques argues on appeal that the district court gave an overly narrow interpretation to the statute's provisions. He claims that his statements to Barlow could fall within the statute and that both caselaw (albeit from other jurisdictions) and public policy support his view. The city, on the other hand, contends that the district court properly construed the provision; it maintains that Marques made no statements to Barlow or other supervisors that reasonably could be construed as reports of violations to a public body.  Our task is complicated by the lack of guideposts. There is no relevant legislative history indicating the intent of Rhode Island lawmakers concerning the interpretation of these terms.  Furthermore, Rhode Island courts have not directly interpreted "report" or "public body" under the statute. We do, however, have the statutory language, which must be construed consistently with its purpose. Our review of the language of the statute, -7- together with an examination of similar statutes from other jurisdictions, with an eye to the public policy underlying such whistleblowers' statutes, counsels a broader view of the statute than that adopted by the district court.  We begin with principles of statutory construction. Where the terms of a statute are clear, a court must give the words their plain and obvious meaning. See Ellis v. Rhode Island ___ _____ ____________ Public Transit Authority, 586 A.2d 1055, 57 (R.I. 1991); ________________________ O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir. 1996) (courts _________ _______ are bound to give statutes a practical, commonsense reading).  Furthermore, a statute may not be construed in a manner that results in absurdities or defeats its underlying purpose. In re _____ Falstaff Brewing Corp., 637 A.2d 1047, 1050 (R.I. 1994). As ______________________ noted, the statute explicitly includes municipal employees in the definition of "public body"; however, the boundaries of the definition of "report" are still unclear. Therefore, we turn to Rhode Island's sister states in search of further clarification.8 Similar whistleblowers' statutes are found in Massachusetts, Maine, New Hampshire, and Connecticut. Of these, the Connecticut statute bears the closest resemblance to the Rhode Island statute at hand, although it, too, has not been the focus of relevant caselaw.9 Generally, these whistleblowers' statutes appear to  ____________________ 8 We look first to those states within our own circuit, and then to the state (Connecticut) with the statute that most resembles the one at issue here.  9 Conn. Gen. Stat. Ann. 31-51m (West 1987)("No employer shall discharge, discipline, or otherwise penalize any -8- fall into two broad categories: statutes like Rhode Island's and Connecticut's, which are broadly drafted, and do not explicitly include statements to an employee's supervisor within the rubric of reports to a public body, and more detailed statutes like those of Massachusetts, Maine and New Hampshire. The statutes in this second category are considerably more complex than those of the first type; these explicitly include statements to a supervisor within protected behavior, and indeed, require it as a preliminary reporting step.10 Clearly, under this type of statute, Marques' statements to Barlow would come under the umbrella of protected actions. Such is not as clearly the case here, where we must deal with a more broadly drafted statute.  Marques, confronted with a paucity of Rhode Island authorities on this issue, points to two cases from other jurisdictions dealing with whistleblowers to support his assertion that public policy supports a broad reading of the Rhode Island Whistleblowers' Act. Appeal of Bio Energy Corp., __________________________ 607 A.2d 606 (N.H. 1992), concerned an employee who was terminated after bringing to her supervisor's attention a  ____________________ employee because the employee ... reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body ....").  10 See, e.g., N.H. Rev. Stat. Ann. 275-E (1987 & Supp. ___ ____ 1995) ("[the protections of this section] shall not apply to any employee unless the employee first brought the alleged violation to the attention of a person having supervisory authority with the employer, and then allowed the employer a reasonable opportunity to correct that violation...."); Mass. Gen. L. ch. 149, 185(b)(1) et seq. (West 1996); Me. Rev. Stat. Ann. tit. 26 831(1) - 833(2) (West 1988). -9- violation of State Department of Labor rules regarding payment of wages. Id. at 607. The court there found that the New Hampshire ___ statute, which mandates an initial report to a supervisor, applies to employees from the point of this initial report. Id. ___ at 608-09. The court noted the dual purposes of the New Hampshire Act: "to encourage employees to come forward and report violations without fear of losing their jobs and to ensure that as many alleged violations as possible are resolved informally within the workplace." Id. at 609. Similar purposes, ___ Marques argues, undergird the Rhode Island statute. The city, however, distinguishes Bio Energy from our case on the grounds __________ that the Rhode Island statute, unlike the New Hampshire one, does not contain specific language including supervisors within the group to whom reports may be made, and that no intent to do so should be inferred.  Bechtel Construction Co. v. Labor Sec'y, 50 F.3d 926, 931-32 ________________________ ___________ (11th Cir. 1995), concerned an internal complaint made pursuant to the whistleblowers' provisions of the Energy Reorganization Act, rather than to a state whistleblowers' Act. There, the court broadly construed the Act's terms (which prohibited discharging or discriminating against employees who assisted with or participated in "proceedings") to encompass the actions of an employee who called violations of procedures for handling radiation-contaminated tools at a nuclear power plant to the -10- attention of his supervisor. Id. at 931-32.11 Marques argues ___ that public policy counsels a similarly broad reading of the Rhode Island statute. The city, however, maintains that the Energy Reorganization Act's inclusion of the "catchall" phrase "or any other action" at the end of the whistleblowers' section in question indicated an intent not present in the Rhode Island statute to extend the protections afforded employees beyond "proceedings" to include internal complaints.  As the whistleblowers' provisions at issue in Bechtel do not _______ mirror those at issue in this case, the comparison of the Rhode Island Whistleblowers' Act to the Energy Reorganization Act, while informative, is not dispositive. But, we take from both this case and Bio Energy an important and applicable public __________ policy consideration -- that employees should not be discouraged from reporting suspected violations initially to supervisors. We see no significant policy served by extending whistleblower protection only to those who carry a complaint beyond the institutional wall, denying it to the employee who seeks to improve operations from within the organization. The latter course appears to us as more likely to lead to prompt resolution of issues related to suspected violations of laws or regulations.  ____________________ 11 The court partially based this finding on the fact that whistleblowers' provisions in other regulations such as the Clean Air Act and the Federal Water Pollution Control Act have been deemed to include internal complaints. Bechtel, 50 F.3d at 932. _______ The court also noted that deference is given to administrative interpretation of regulations under Chevron v. Natural Resources _______ __________________ Defense Counsel, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984). _____________________ -11- We therefore conclude that a jury permissibly could find the Rhode Island Whistleblowers' Act applicable to statements made by an employee to a supervisor concerning known or suspected violations of the law. The terms of the statute specifically define a "public body" as including "[a]...city...governing body...or any...employee thereof." We do not read this language as covering all municipal employees, such as a co-worker, but as including a superior charged with carrying out the policies and decisions of the city. While the Act does not explicitly address statements to supervisors, as do other states' whistleblowers' statutes, the public policy behind these statutes is surely similar: to encourage the prompt reporting and early, amicable resolution of potentially dangerous workplace situations, and to protect those employees who do report such violations from retaliatory action by employers.  We do not, of course, hold that a verdict for Marques is therefore mandated; the jury must decide whether the statements he made fall under a more expansive reading of the statute than that allowed by the district court, and then whether Marques was actually fired as a result of his statements to Barlow. However, we think that the question of whether Marques' statements bring him within the protection of the Rhode Island Whistleblowers' Act was one for the jury, and not a proper subject for a directed verdict.  Marques raised concerns about the project twice with Gammell on December 22nd: first, when he initially received the -12- assignment to work in the boat on Jones Pond, and then again, at the Pond, where he fruitlessly asked Gammell for a life preserver. Furthermore, Marques testified on direct examination that on December 23rd, after the morning break, he told Barlow he did not want to go back in the boat because he felt sick, that he did not feel conditions in the pond were safe, and that he still had not gotten a life preserver. On cross examination, Marques again testified that he had told Barlow he was not feeling well, that he was not going back in the boat, and that during general conversation on the shore, he and others discussed the safety of the project. Moreover, as we have observed in note 2, supra, the _____ evidence of the depth of the pond was not so clear that Marques' fear was completely unfounded. We do not feel that a reasoned factfinder could have reached but one conclusion on the issue whether these statements constituted a report of a violation covered by the Rhode Island Act and whether Marques' termination was the result of his statements. Accordingly, we vacate the directed verdict on the Rhode Island Whistleblowers' Act claim and remand it for retrial. B. Negligent/Intentional Infliction of Emotional Distress Claim ____________________________________________________________ Marques also appeals the district court's grant of a directed verdict for the city on his claim that the city's actions either negligently or intentionally caused him emotional distress. Under Rhode Island law, a plaintiff, to succeed, must show that 1) the defendant's conduct was intentional or in reckless disregard of the probability of causing emotional -13- distress, 2) the conduct was extreme and outrageous, 3) there was a causal connection between the wrongful conduct and the emotional distress, and 4) the emotional distress in question was severe. See Champlin v. Washington Trust Co., 478 A.2d 985, 989 ___ ________ ____________________ (R.I. 1984) (adopting standard of Restatement (Second) of Torts  _____________________________ 46). Additionally, Rhode Island requires a physical manifestation of the emotional distress. Id. at 990. The ___ district court rejected this claim on the ground that the evidence presented was insufficient to warrant a finding that the city's actions in terminating Marques were extreme and outrageous.12 We agree. While being terminated several days shy of the end of his probation period may not have been pleasant for Marques, we do not believe that a jury would properly have found on the evidence presented that the conduct of Barlow, Gammell, and Lemont was sufficient to make an "average member of the community ... exclaim 'Outrageous'." Borden v. Paul Revere Life ______ ________________ Ins. Co., 935 F.2d 370, 380 (1st Cir. 1991) (quoting Restatement ________ ___________ (Second) of Torts 46, comment (d)).13  _________________  ____________________ 12 In assessing whether conduct is extreme and outrageous, Rhode Island courts have used three factors: 1) the conduct itself; 2) the particular relationship of the parties; and 3) the known or knowable susceptibility of the plaintiff to the emotional injury. Russell v. Salve Regina College, 649 F. Supp. _______ ____________________ 391, 401 (D.R.I. 1986), aff'd, 890 F.2d 484 (R.I. 1989). _____ 13 Both parties note that in Moniodis v. Cook, 494 A.2d ________ ____ 212 (Md. 1985), the court found an employee who was discharged after her refusal to submit to a polygraph test stated a colorable claim for intentional infliction of emotional distress on the grounds that the employer's actions were extreme and outrageous because the employer knew the employee was dedicated to her work, that she had a pre-existing nervous condition, and she was emotionally debilitated as a result of the termination. -14- C. Rhode Island Boating Law ________________________ Finally, Marques appeals the directed verdict on the Rhode Island Boating Laws claim.  R.I. Gen. Laws 46-22-15 provides that  the owner of a vessel shall be liable for any injury or damage occasioned by the negligent operation of the vessel, whether the negligence consists of a violation of the provisions of the statutes of this state, or neglecting to observe such ordinary care and such operation as the rules of the common law require. This statute therefore requires "negligent operation" of a vessel and that a plaintiff's injuries be proximately caused by this negligent operation. Even were negligent operation of the boat in question to be found, as to which we express some doubt, this claim would nevertheless founder on the proximate cause requirement: the connection between Marques' injuries, including his discharge and resulting alleged damages, and the city's operation of the boat on Jones Pond is too attenuated. We therefore affirm the district court's ruling on this claim too.  CONCLUSION The Rhode Island Whistleblowers' Act properly may be construed to encompass statements made by an employee to a supervisor concerning known or suspected violations of the law.  This accords with the terms of the statute itself, and with the public policies underlying this type of statute. As a jury could have inferred that Marques' statements to Barlow constituted such  ____________________ We find the facts of that case as they related to the employer's actions clearly distinguishable in nature and degree from those alleged here.  -15- "reports" to a "public body" under this broader construction of the statute, and that he was fired as a result of these statements, we vacate the district court's directed verdict on this claim. However, we affirm the district court's judgments on the negligent/intentional infliction of emotional distress claim and on the violation of the Rhode Island Boating Safety Act claim.  Affirmed in part and vacated and remanded in part. One half _________________________________________________ ________ costs to appellant. ___________________ -16-