Harold J. MATURI, and Henry G. Maturi, Plaintiffs,

v.

McLAUGHLIN RESEARCH CORP., Defendant.

No. C.A. 99–611S.

United States District Court, D. Rhode Island.

July 22, 2004.

Robert C. Corrente, Esq., Christopher R. Bush, Esq., Hinckley, Allen & Snyder, Providence, RI, Michael G. Geffroy, Esq., U.S. House of Representatives, Committee on Energy & Commerce, Washington, DC, for Plaintiff.

Joseph V.Cavanagh, Jr., Esq., Blish & Cavanagh, Providence, RI, Mary Jo Johnson, Esq., Karen R. Green, Esq., Wilmer Cutler Pickering Hale & Dorr, LLP, Boston, MA, James H. Reilly, III, Esq., Kelly, Kelleher, Reilly & Simpson, Providence, RI, Raymond A. Marcaccio, Esq., Providence, RI, Richard G. Galli, Esq., East Greenwich, RI, for Defendants.

## DECISION AND ORDER

SMITH, District Judge.

This case requires the Court to decide whether the scope of the federal False Claims Act reaches the type of adverse employment activity at issue in this case. Defendant McLaughlin Research Corporation (MRC) moves for summary judgment on all counts of the Complaint. For the following reasons, Defendant's motion is granted.

### I. *Facts*

The following facts are undisputed unless otherwise noted. MRC is a defense contractor that provides engineering services to the United States government. MRC was founded by Charles McLaughlin, Sr. in 1958. Plaintiffs Harold Maturi (Harold) and Henry Maturi (Henry) are brothers who were hired by MRC in the mid–1970's and remained employed there until their simultaneous termination on September 10, 1998. At all relevant times, Harold was MRC's president, COO, and a member of the Board of Directors, and Henry was MRC's executive vice-president. At all relevant times, Andra Kelly (Andra), the daughter of MRC's founder, was the Chairperson of MRC's Board of Directors and supervised Harold and Henry.[1] The principal shareholders of MRC are Andra, her brothers Bruce and Douglas McLaughlin, and her niece Brandy McLaughlin–Wall. Andra's son, Conn Kelly, and her niece, Morgen McLaughlin, are also shareholders in MRC. In addition to MRC, the McLaughlin family owns (or owned at one time) a number of other subsidiary companies, including ABCD Realty, McLaughlin Vineyards, Computer Aircraft Maintenance Procedures, and Program Monitor, Inc. (collectively "Subsidiaries"). Finally, the McLaughlin family formed McLaughlin Partners (Partners) approximately twenty years ago, ostensibly to provide management support services to the Subsidiaries for a fee.

As a government contractor, MRC provides the federal government with a provisional budget based on estimated costs that will be incurred within the following year. Both Harold and Henry had authority to make changes to this budget and did so regularly. Additionally, Harold was responsible for meeting with the Defense Contract Audit Agency (DCAA), a government agency that performed audits on MRC from time to time, to discuss specific costs. Both Harold and Henry had complete authority to determine whether an MRC charge would be submitted to the government or disallowed.

Though Plaintiffs make a number of claims with respect to what they believe

---

1. Plaintiffs claim that Andra was the CEO of MRC; Defendant contends that Harold was CEO. The dispute is not material and therefore will not be resolved here.

were improper business practices at MRC throughout the years of their employment, they concede in their opposition papers that "the only issues directly related to their firing were the 1998 issues." Pl. Mem. Opp. S.J., at 14. There are two such "1998 issues."

First, in 1998 Andra added her niece, Morgen McLaughlin (Morgen), to the MRC payroll. Plaintiffs allege that Morgen rarely showed up for work, never worked when she did show up, was found asleep at her desk on one occasion, and continued to submit time cards fraudulently when she was out on maternity leave. Defendant disputes these allegations. There is no dispute, however, that Harold complained to Andra about Morgen's activities but that neither Plaintiff reported these alleged misdeeds to the government or took any other action in 1998 with respect to their claims about Morgen. At some point in 1998, Harold made the decision that MRC would stop paying Morgen.

Second, in June of 1998, Andra made her son, Conn Kelly (Conn), the Director of Marketing at MRC. Conn had previously worked for Partners in an undisclosed function. Plaintiffs claim that the title of Director of Marketing was created for Conn at Andra's insistence and that Conn had no business training or experience. During the term of Conn's employment at MRC, Plaintiffs allege that they learned from various MRC employees that Conn was collecting two salaries and double 401k contributions, one from MRC and one from Partners. The parties appear to agree that Conn was, in fact, receiving two salaries and retirement contributions, but Defendant disputes that the government was ever billed for Conn's MRC salary and benefits and there is no evidence to refute this contention. A series of confrontations between Plaintiffs and Conn ensued. Plaintiffs both independently urged Conn

to report his alleged "double dipping" to the DCAA auditors. Conn refused to do so. Harold then told Conn that he was going to report the double dipping to the DCAA and that "this [double dipping] is fraudulent," and that "people go to jail on this issue." Pl.App. Ex. E, at 164. Conn responded that if Harold reported him, he would have Harold fired. On August 24, 1998, Harold wrote a letter to Andra stating:

> Recently it [ ] has been brought to my attention by several employees of MRC that Conn has been receiving two salaries. . . . In that we are subject to DCAA Audits there could be a potential problem should they uncover this during one of their audits. At the very least I am sure they would make one of them unallowable. . . . Also, I am not sure how DCAA would look on the fact that indirectly MRC is paying his salary through both overhead and G & A [General & Administrative]. As President and a member of the Board I don't feel that two salaries are appropriate or necessary. From a personal stand point, I feel that it is highly inappropriate to cut the salaries and bonuses of my people to lower the overhead and G & A and yet substandardly [sic] raise Conn's salary. . . . I tried to discuss this with Conn . . . but he couldn't or wouldn't recognize the problem. I am looking to you for guidance, as Chairman[,] to help me resolve this situation.

Pl.App. Ex. N. Andra did not respond to this letter.

During this same period (and, Plaintiffs allege, as a result of the deteriorating relationship between the parties), Andra hired a management consultant named James Waddell to conduct a review of MRC's operations. Waddell is Andra's son-in-law. Plaintiffs claim, and Defendant denies, that Conn was also involved in the decision to

hire Waddell. Waddell had no prior experience with defense contractors, computer operations, or military businesses. Waddell held a series of meetings with MRC middle managers, which Conn arranged to occur while the Maturis were on vacation. Plaintiffs allege, with some record support, that the purpose of these meetings was to gather negative information about the Maturis. In August 1998, Waddell submitted a report (reviewed and revised in draft by Conn and Andra) that criticized the Maturis' management style as "top-down and dictatorial."

At some point thereafter, Andra, Conn, and Waddell held a conference call. Waddell's notes from that call contain the statement, "Letter re Conn is focal point." [2] Pl.App. Ex. P (Bates No. 106957). On September 10, 1998, Harold met with Andra and MRC's counsel, Howard Kleiger, at MRC's New York office. Andra tearfully informed Harold that his accusation about Conn's double dipping was "the last straw". Pl.App. Ex. C, at 59. There is a factual dispute about whether or not Andra stated that Harold's letter constituted a "threat." Andra then fired Harold and Henry (despite the fact that Henry did not attend this meeting). It is undisputed that neither Plaintiff filed or threatened to file a federal false claims action or qui tam action [3] on behalf of the government pre-termination. It is also undisputed that neither Plaintiff filed or

threatened to file a qui tam action on behalf of the government post-termination.

On November 22, 1999, counsel for Plaintiffs sent Andra a letter enclosing a proposed complaint and several discovery requests. As the parties did not settle their disputes, Plaintiffs filed their lawsuit on their own behalf on December 17, 1999. The Complaint sets forth two causes of action: violation of the whistleblower provision of the False Claims Act, 31 U.S.C. § 3730(h); and (2) violation of the Rhode Island Whistleblowers' Protection Act, R.I. Gen. Laws § 28–50–1, *et seq.*[4]

## II. *Standard of Review*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When a motion for summary judgment is directed against a party that bears the burden of proof, the movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that showing is

---

**2.** In their opposition brief, Plaintiffs state that the note reads, "Letter to Conn is focal point," Pl. Mem. Opp. S.J. at 7, but the Court has looked at Waddell's note and believes that its reading is accurate and makes better sense.

**3.** "Qui tam pro domino rege quam pro se ipso in hac parte sequitur" ("He who sues on the King's behalf does so also for himself"). *See Black's Law Dictionary* 867 (6th ed.1991). A qui tam action "is an action brought by an informer, under a statute which establishes a penalty for the commission or omission of a

certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the remainder to the state or some other institution." *Id.* In this case, the statute authorizing a qui tam action is the False Claims Act discussed below.

**4.** Plaintiffs met with two members of the Naval Criminal Investigative Service (NCIS) on May 31, 2000, but there is little in the record about the substance of the meeting. It does appear that several Federal Acquisition Guidelines (FARs) were discussed.

made, the nonmovant then bears the burden of producing definite, competent evidence to rebut the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atl. & Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir. 1989). In other words, the nonmovant is required to establish that there is sufficient evidence to enable a jury to find in its favor. *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997).

## III. *Analysis*

### A. *Count I: The False Claims Act*

■ The False Claims Act, 31 U.S.C. § 3729, *et seq.* (FCA), prohibits the submission of false or fraudulent claims to the federal government. *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 224 (1st Cir.2004). The First Circuit has recently set forth the standards for liability under the FCA:

> The FCA imposes liability upon persons who 1) present or cause to be presented to the United States government, a claim for approval or payment, where 2) that claim is false or fraudulent, and 3) the action was undertaken "knowingly," in other words, with actual knowledge of the falsity of the information contained in the claim, or in deliberate ignorance or reckless disregard of the truth or falsity of that information.

*Id.* at 225 (citing 31 U.S.C. § 3729(a)(1), (b)). However, "[n]ot all fraudulent conduct gives rise to liability under the FCA." *Id.* Liability only attaches to a claim for payment, "not to the underlying fraudulent activity." *Id.* The statute defines a claim, in relevant part, as "any request or demand ... for money or property ... if the United States Government provides any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

■■ As discussed above, private persons are entitled to file actions alleging FCA violations individually and on behalf of (qui tam) the federal government. 31 U.S.C. § 3730(b). Under section 3730(h),

> [a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). Thus, a plaintiff alleging employment retaliation under the FCA must make the following prima facie showing: (1) that the employee's conduct was protected under the FCA; (2) that the employer knew that the employee was engaged in such conduct; and (3) that the employer discharged or discriminated against the employee because of his protected conduct. *Karvelas,* 360 F.3d at 235. If the employee makes his prima facie case, the burden shifts to the employer to demonstrate that the employee would have been terminated or subjected to other adverse action even if he had not engaged in the protected conduct. *Id.*

■ Since the latter two elements cannot exist without the first, *id.* at 237 n. 22, the Court turns to the element of "protected conduct," which "does not require the plaintiff to have filed an FCA lawsuit or to have developed a winning claim at the time of the alleged retaliation." *Id.* at 236.

Instead, "protected conduct" is a broader (and vaguer) concept under the FCA; it includes those acts performed "in furtherance of" an FCA action. 31 U.S.C. § 3730(h). Following the formulation in other circuits, the First Circuit has construed the phrase "in furtherance of an action under [the FCA]" to mean "conduct that reasonably could lead to a viable FCA action." *Karvelas*, 360 F.3d at 236. Despite this generous standard, however, courts have recognized that "[e]vidence of an actual false claim is 'the *sine qua non* of a[n FCA] violation.'" *Id.* at 225 (citing *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir.2002), *cert. denied*, 537 U.S. 1105, 123 S.Ct. 870, 154 L.Ed.2d 774 (2003)); *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir.1999) (FCA "at least requires the presence of a claim—a call upon the government fisc—for liability to attach.").

■ The evidence is undisputed that MRC made no "claim" to the government with respect to either of the two relevant 1998 issues. Plaintiffs do not allege that a claim was ever made to the government for MRC's payment to Morgen while on maternity leave. Neither Plaintiff reported this infraction to anyone outside MRC and Harold himself decided unilaterally that MRC would not pay Morgen any longer. Without evidence that Morgen's salary was ever presented as a claim to the government, Plaintiffs cannot use the alleged illegitimacy of MRC's payments to Morgen as a basis for their FCA whistleblower action. *See id.*

The same goes for Conn's alleged double dipping. While Plaintiffs argue that at least one of the salaries was charged to the government, their respective depositions demonstrate substantial incertitude on this point. For example, Harold's deposition contains the following exchange:

QUESTION (by Ms. Johnson): Okay. Tell me, sir, was Conn Kelly's salary reported to the government as of the date you wrote the [August 24, 1998] letter?

ANSWER: Was it reported to the government?

QUESTION: Right. Did they have a request for payment of . . . Conn Kelly's two salaries?

ANSWER: I, oh, I don't know. I can only tell you that Vinny Pinto[5] thought they did because he was the one chewing up and down my back with regard to this situation.

Aff. Mary Jo Johnson Ex. A, at 169. Likewise, Henry did not know whether the government had been double-billed for Conn's salaries:

QUESTION: Do you have any personal knowledge of any budget submitted, which had Conn Kelly's salary in it?

ANSWER: I will say again that, unless I saw a piece of paper, I don't remember it being done or not being done. But it was a matter of routine to modify the budgets during the year, and it could have been done. If I saw the budget from one quarter to the other, I probably could have picked it out, but I don't remember it. . . . I don't know.

Aff. Johnson Ex. C, at 30.

■■ Even assuming that Conn's double salary and benefits had been claimed to the government, Plaintiffs face an additional hurdle that they cannot overcome.

---

5. Vinny Pinto was MRC's vice president and comptroller during the relevant period. While he testified that he found it "unusual" that Conn was receiving double compensa-

tion, he did not testify that any of those monies were submitted as a claim to the government. Pl.App. Ex. G, at 356–363.

While the First Circuit has not ruled directly on this point, numerous courts have held (as does this Court) that employee actions that would otherwise be deemed "protected conduct" under the FCA cannot sustain an FCA suit if they fall under the regular responsibilities or duties of that employee; such employees must "make clear" that they will bring or assist in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations. *See, e.g., Yuhasz v. Brush Wellman, Inc.,* 341 F.3d 559, 567–68 (6th Cir. 2003) ("By informing Brush that its certifications were illegal and that other companies had incurred liability under the FCA for false claims, Yuhasz was simply performing his ordinary duties as a supervisor of laboratory testing."); *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 194 (3rd Cir.2001) (paralegal whose inquiry into client overcharges was in response to assigned task, and who stated to employer that overcharges were "unethical," could not bring FCA action); *United States ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1523 (10th Cir.1996) (director of mental health clinic who informed supervisors of non-compliance with Medicaid regulations could not maintain FCA action since monitoring and reporting were part of employment obligations); *X Corp. v. Doe,* 816 F.Supp. 1086, 1095–96 (E.D.Va.1993) (in-house counsel who informed members of legal department and a management committee member of company's several acts of fraud on the federal government was merely fulfilling job obligation to raise relevant legal issues); *cf. United States ex rel. Yesudian v. Howard Univ.,* 153 F.3d 731, 743–44 (D.C.Cir.1998) (purchasing department employee who informed various executives about another employee's false time and attendance records, acceptance of bribes, provision of inside information, unauthorized payoffs, and appropriation of university property for personal use—none of which were part of plaintiff's regular employment obligations—could maintain an FCA action).

There is no dispute that Harold and Henry were responsible for dealing with the DCAA and that both had unfettered authority to deem a government claim unallowable. In fact, Harold had discretion to pay or cease paying any MRC employee altogether, and he exercised his power to stop paying Morgen accordingly. This power flowed directly from Harold's authority as a top-level executive at MRC whose primary job responsibilities were the oversight and management of MRC's finances and its claims relationship with the federal government. Conn's official position at MRC was inferior to Harold's; Harold therefore was responsible for overseeing Conn's earnings and the propriety of their submission as claims to the government.

Admittedly, this action presents some unique circumstances that differ from the typical "within job responsibilities" case. The nepotistic overtones of MRC's employment hierarchy pervade the record, and it might not necessarily be unreasonable for a factfinder to infer that Harold, Henry, and perhaps other MRC employees would have been hesitant to reprimand Conn (let alone threaten a qui tam action against MRC) in the face of his favored filial status. Reasonably drawing such an inference, however, would require some evidence that Harold had (for example) been constructively stripped of his power to deem expenses unallowable because of Conn's family ties, or that he had been told by Andra that Conn was to receive whatever compensation and benefits he desired. Plaintiffs themselves have asserted that this did not occur; indeed, only months before, Harold had exercised his powers with regard to the salary of Morgen

McLaughlin. Harold was fully capable of making Conn's salary an unallowable claim as part of his regular job responsibilities. Since investigation into the propriety of Conn's remuneration, and the discretion to disallow these costs, was well within Harold's employment obligations, Plaintiffs have failed to show that they engaged in "protected conduct" under the FCA.[6] Summary judgment is therefore appropriate on Count I of the Complaint.

## B. Count II: The Rhode Island Whistleblowers' Protection Act

■ The Rhode Island Whistleblowers' Protection Act (RIWPA) protects an employee who is discharged, threatened, or otherwise retaliated against

> [b]ecause the employee . . . reports or is about to report to a public body, verbally or in writing, a violation which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the law of . . . the United States.

R.I. Gen. Laws § 28–50–3(1) (1995). As of the Plaintiffs' terminations in 1998, this was the only provision of the RIWPA that might arguably have applied to these circumstances.

The RIWPA was amended in 2002 to add one other provision: it now also prohibits an employer from discharging, threatening, or otherwise retaliating against an employee

> [b]ecause the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of . . . the United States.

R.I. Gen. Laws § 28–50–3(4) (2002). Plaintiffs argue that section 28–50–3(4) should be applied retroactively to protect them. This Court disagrees.

■ The rule in Rhode Island[7] is that "statutes and their amendments are 'to operate prospectively unless it appears by clear, strong language or by necessary implication that the Legislature intended to give the statute retroactive effect.'" Theta Properties v. Ronci Realty Co., Inc., 814 A.2d 907, 915 (R.I.2003) (citations omitted). The text of the RIWPA is silent as to the retroactivity vel non of section 28–50–3(4). The presumption, therefore, is against retroactivity.[8]

---

**6.** The Court notes that Plaintiffs cannot succeed on the second element of an FCA action as well—that the employer know that the employee is engaged in "protected conduct." Harold's August 24, 1998 letter to Andra does not at all make clear that Harold was contemplating an FCA action as a result of Conn's double dipping. It calls upon Andra to "help resolve this situation" and expresses misgivings about the propriety of submitting two salaries to the government. The Court therefore cannot say that MRC had notice, given Harold's significant authority within the company, that Harold either intended to report Conn's double dipping to the government or threatened to bring a qui tam action against MRC on that ground. See Ramseyer, 90F.3d at 1522–23 (plaintiff's FCA action could not survive because he never made clear to defendants that he intended to report his allegations to the government or contemplated bringing a qui tam action).

**7.** Rhode Island's retroactivity principles, not those of federal law, dictate whether section 28–50–3(4) is to be given retroactive effect. See Burleson v. Saffle, 292 F.3d 1253, 1255 (10th Cir.2002) ("[W]hether or not a new rule of state law may be applied retroactively is a pure state law question.").

**8.** The legislative history of the 2002 amendment supports this conclusion. See H 6909 Substitute A, 2002 Gen. Assem., Jan. Sess. (R.I.2002) ("An Act Relating to Whistleblowers' Protection") (stating that the amendment "shall take effect upon passage").

Plaintiffs are left with section 28–50–3(1), but that provision requires that a plaintiff either report (or be about to report) a violation "to a public body." Under the statute, "public body" is defined as

(i) A state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government.

(ii) An agency, board, commission, council, member, or employee of the legislative branch of state government.

(iii) A county, city, town, or regional governing body, a council, school district, or a board, department, commission, agency, or any member or employee of the entity.

(iv) Any other body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body.

(v) A law enforcement agency or any member or employee of a law enforcement agency.

(vi) The judiciary and any member or employee of the judiciary.

(vii) Any federal agency.

R.I. Gen. Laws § 28–50–2(4). MRC and its employees clearly do not fall into any of these categories. Plaintiffs point to *Marques v. Fitzgerald*, 99 F.3d 1 (1st Cir.1996), where the First Circuit held that a *municipal* employee's complaint to a supervisor about known or suspected violations of the law was protected by the RIWPA because a municipality and its employees fall within the statutory definition of "public body." *Id.* at 6. Since the same obviously cannot be said for MRC, Plaintiffs cannot maintain an action under the RIWPA and summary judgment must enter.

## IV. *Conclusion*

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.