Sandra F. ROSSI, Plaintiff,

v.

AMICA MUTUAL INSURANCE
COMPANY, Defendant.

No. C.A. 02–485L.

United States District Court,
D. Rhode Island.

Feb. 9, 2005.

Stephen T. Fanning, Providence, RI, for Plaintiff.

James M. Paulson, Esq., Joseph P. Mcconnell, Esq., Morgan, Brown & Joy, LLP, Boston, MA, Raymond A. Marcaccio, Esq., Providence, RI, for Defendant.

*DECISION AND ORDER*

LAGUEUX, Senior District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment on all seven Counts in Plaintiff's Complaint. Plaintiff charges that Defendant, her former employer, unfairly discriminated against her by terminating her employment, in contravention of federal and state laws.

After consideration of the evidence submitted by the parties and a review of the pertinent law, this Court concludes that summary judgment will be granted, in favor of Defendant, on all Counts of Plaintiff's Complaint.

## Background

Sandra F. Rossi (hereinafter "Rossi" or "Plaintiff"), of Lincoln, Rhode Island, was born in 1937 and completed a high school education. Amica Mutual Insurance Company (hereinafter "Amica" or "Defendant") is headquartered in Lincoln, Rhode Island. As of March 2001, when Rossi's active employment at Amica ended, she had worked there for about twenty-five years, for most of that time as a Premium Processor II in the Accounting Department.

As a Premium Processor II, Rossi sorted through the incoming mail, opening and processing envelopes containing premium payments. Much of the work was automated, as there was a machine that slit open the envelopes (the OPEX 50) and another machine that sorted the invoices and the checks (the NDP 500). Rossi had to carry bins filled with envelopes and payments back and forth to the machines. In addition she operated the machines, which consisted of pressing the buttons to turn the machines on, keeping the paper flowing through the machines, and occasionally changing the ribbons.

In recent years, Rossi suffered from diabetes, asthma and chronic pulmonary lung disease. Despite these ailments, there does not appear to have been any adverse impact on Rossi's employment until March 15, 2001, when Rossi's physician, Dr. Curtis Mello, a specialist in pulmonary and critical care medicine, directed that she use a portable oxygen device twenty-four hours a day. The following day, Rossi called Amica's occupational nurse, Dianne Wilkie, and informed her of the situation. Later that day, Rossi met with the nurse and presented a note from Dr. Mello explaining that she required oxygen during work hours.

This news triggered a series of meetings, phone calls and e-mails among Amica staff and Rossi during the next several days, during which time Rossi stayed home from work. The Amica staff members were primarily concerned about the safety of Rossi continuing to operate the mail sorting machines while hooked up to a portable oxygen tank. It was conceivable, they opined, that the machines could generate a spark, caused by static electricity, or a staple or paper clip going through the machines, which might pose a fire hazard around an oxygen tank. In addition, they feared that the tubes of the tank extending to her nostrils could get tangled in the machines, or that the tank would make it difficult for Rossi to move around the office with the mail bins.

To address these concerns, Amica conducted an informal investigation. Fred Brown, Rossi's immediate supervisor, contacted the sales representative for the Opex 50 who told him that it was probably "not a good idea" to use an oxygen tank near the machine. Brown also called the account manager for the NDP 50, who said it probably "wasn't all that safe" to operate the machinery while using oxygen. Both suggested that Brown contact their companies' legal counsel if Amica wanted something in writing. Nurse Wilkie called

"Derek," (last name Plante) the technician who had provided Rossi with her oxygen tank. She says that Derek told her that, while liquid oxygen was very safe, he "could not guarantee there would not be a problem." Derek also stated that, "All patients on oxygen are told to keep at least eight feet away from flames or ignition sources." Rossi disputes that this is what Derek told Wilkie although she has no personal knowledge of the conversation.

In the meantime, Rossi met with Patricia Talin, vice president for human resources, and Maribeth Williamson, vice president for accounting. At this meeting, Talin and Williamson expressed their concerns over the perceived safety hazards of using oxygen in the vicinity of the mail sorting machines. Beyond this topic, the substance of the meeting is disputed by the parties.

The Amica employees recall that Rossi recognized and agreed that it might be dangerous for her to operate the machines while she used the oxygen tank. They claim that they discussed another job that might work out for her, an "imaging" job, but that Rossi wasn't interested because it was in a different building in the Amica complex. In addition, they remember offering Rossi preferential treatment on any positions that might become open, and suggesting that Rossi take some tests conducted by the human resources department to determine her qualifications.

Rossi recalls being told that, because of the safety concerns, Amica no longer had a job for her. When she asked if that meant she had to quit, they mentioned the possibility of the imaging job, but they had to check out what machinery was involved in that position. Rossi does not recollect that she concurred about the dangers posed by the oxygen tank. She recalls expressing interest in the imaging job. Rossi does not recall any discussion of preferential hiring for other positions. As for the qualifications tests, she states that she told Talin and Williamson that she had already taken those tests.

According to Rossi, the next day, a scheduled flex day off for her, Talin called her at home to explain that Amica had determined that the imaging job would not be appropriate. But Talin had another proposal: the company would permit Rossi to use her accumulated sick time—110 days—which, along with 48 days of vacation "donated" by two Amica executives, would carry her to her 65th birthday when she could retire with full benefits. Rossi told Talin that she had hoped to work beyond age 65, and that she didn't like the idea of taking her colleagues' vacation time. Talin suggested that Rossi take some time to think it over, and the phone call was concluded. Within the hour, however, Rossi called her back and accepted the proposal.

Talin told Rossi that Amica would require a letter from her doctor stating that she was unable to work, but that she could start taking her sick days right away. A few weeks later, Rossi returned to the office to clean out her desk and her accounting colleagues threw a retirement party for her. On April 4, 2001, Rossi sent a letter to Amica's president. Her letter stated:

I wasn't satisfied with the way I was treated by Personnel. They told me I couldn't continue my job, because of the oxygen and the sparking hazard. And— they called me over to tell me they had nothing in the way of a job to offer me. When I called Social Security, they told me that was against the law—and to speak with an attorney. That's when I called you.

Somehow this all worked out. Personnel phoned me at home to tell me I had enough sick time and vacation time to

carry me through until February 1, 2002, when I could officially retire at age 65. I want to thank you for any input you may have had.

Pursuant to this arrangement with Amica, Rossi went on to collect her regular pay from March 27, 2001, to February 1, 2002, her effective retirement date. Her accumulated sick leave was augmented by 48 days of vacation leave donated by two Amica executives.

On April 25, 2001, Amica received the "Certification of Health Care Provider" from Dr. Mello. In the Certification, Dr. Mello explains that Rossi suffered from oxygen dependent emphysema; that she was unable to perform her normal duties; and that she was unable to perform work of any kind. Also in April 2001, Rossi applied for temporary disability insurance (TDI) from the State of Rhode Island, obviously based on her doctor's certification. In deposition testimony, Rossi stated that she received TDI payments of approximately $600 a month for eight or nine months during this time period. Pursuant to Rhode Island statute, to be eligible for temporary disability insurance payments, a person must be "unemployed and unable to perform his or her regular or customary work or services." Rhode Island General Laws § 29–39–2(19).

Apparently, some weeks after leaving active employment at Amica, and while receiving TDI payments and sick pay from Amica, Plaintiff's condition improved. Plaintiff was advised by her doctor that she could forgo use of the oxygen tank if she was simply sitting for a period of time. She never informed anyone at Amica of this changed condition, did not seek to come off sick leave and resume active employment at Amica, and did not seek to revoke her election to retire.

In December 2001, while still on the Amica payroll, Rossi filed a complaint with the Rhode Island Commission for Human Rights, and the federal office of the Equal Employment Opportunity Commission. In the complaint, Rossi asserted that Amica discriminated against her when it "forced" her "separation" from the company. However, at no time during her period of leave from March 2001 to February 2002, did Rossi make any attempt to rescind her election to retire or to revisit her leave arrangement in any way—despite the fact that she was still an employee of Amica and still on its payroll.

On February 1, 2002, while her Human Rights Commission complaint was pending, Rossi's retirement became effective. At that time, she began to receive her full pension from Amica, as well as continued health and dental insurance under her Amica plan. In addition, she applied for and received social security retirement benefits.

In May 2002, Rossi began working at a desk job at Rhode Island Hospital in the area of patient information. In September 2002, she received the procedural "Notice of Right to Sue" from the EEOC. Rossi then filed her complaint in this Court in November, 2002.

## Analysis

### Standard of Review

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Federal Rule of Civil Procedure 56(c) requires that summary judgment be granted if there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. A material fact is one which affects the lawsuit's outcome. *URI Cogeneration Partners L.P. v. Board of*

*Governors for Higher Education,* 915 F.Supp. 1267, 1279 (D.R.I.1996). Factual disputes are genuine when, based on the evidence presented, a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To win summary judgment on a particular count of the complaint, the moving party must show that "there is an absence of evidence to support" the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

### Count I

■ Rossi charges that Amica violated federal law prohibiting workplace discrimination against those with disabilities, 42 U.S.C. § 12101 et seq., known as the Americans with Disabilities Act or "ADA." In order to prevail on a claim under the ADA:

> ... a plaintiff must prove by a preponderance of the evidence (1) that she was disabled within the meaning of the ADA; (2) that she was able to perform, with or without reasonable accommodation, the essential functions of her job; and (3) that the adverse employment decision was based in whole or in part on her disability.

*Soto–Ocasio v. Federal Express Corp.,* 150 F.3d 14, 18 (1st Cir.1998). There is no dispute between the parties that Rossi was disabled within the meaning of the ADA.

As for part two of the test, Defendant argues that Rossi was unable to perform the essential functions of her job because of the safety threat posed by the office machines and the oxygen tank. In March 2001, Amica conducted only a preliminary and informal investigation into the potential hazards of utilizing a portable oxygen tank in this particular workplace environment. Since this lawsuit was filed, both sides have found experts who are prepared to present apparently contradictory testimony. Amica, if required, will present expert testimony that the situation posed a grave risk to Rossi and her coworkers. Rossi, on the other hand, would present evidence to show that there were no risks associated with operating a mail sorting machine while connected to an oxygen tank.

There may be a genuine dispute as to whether Rossi could have performed the essential functions of her job while on oxygen, and as to whether some reasonable accommodations could have been made to enable her to continue working while on oxygen.[1] Understandably, Amica never really evaluated these issues because, among other reasons, it thought that it had come up with a solution to the problem by permitting Rossi to bridge her sick days and vacation time until retirement age.

The dispute over whether Rossi could perform the essential functions of her job, while genuine, *is not material* because Plaintiff is unable to establish the third part of the prima facie case as outlined by *Soto–Ocasio:* Rossi is unable to demonstrate that there was an adverse employment action taken against her. From the undisputed evidence presented, it is obvious that Plaintiff chose to retire rather than explore further employment options with Amica. It is pure speculation that extended negotiations between Rossi and

---

1. Rossi never requested any particular accommodation, then or later.

Amica would have resulted in her release from employment or that a suitable position would not have been found for her. However, speculation of this nature is not sufficient to survive summary judgment scrutiny. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265. As an adverse employment decision is central to any claim of employment discrimination, whether it be based on disability, age, race, color or creed, Rossi's inability to show that any adverse action occurred is fatal to all five of her claims alleging workplace discrimination.

In the present case, Amica made a very attractive offer to Rossi, given her age and deteriorating health, and she clearly accepted the offer. In a similar case, *Schuler v. Polaroid Corp.,* 848 F.2d 276 (1st Cir.1988), the First Circuit, in analyzing an age discrimination claim, wrote:

> At the outset, we note that Schuler cannot base his 'age discrimination' claim upon the attractive terms that the severance plan offered. That plan was a carrot, not a stick and for reasons the Seventh Circuit has set forth in *Henn v. National Geographic Society,* 819 F.2d 824, a 'carrot' cannot ordinarily violate the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (1982); that act does not forbid treating older persons more generously than others.

*Schuler,* 848 F.2d at 278; see also *Dominguez v. Eli Lilly & Co.,* 958 F.Supp. 721 (D.P.R.1997).

In the *Henn* case, cited above, the Seventh Circuit reviewed a generous early retirement plan offered to the magazine's advertising sales staff who were over the age of fifty-five. Several salesmen opted for the early retirement package, but regretted it later and sued the company for age discrimination, claiming that fear of losing their jobs due to declining advertising sales had forced them to take the company's offer. The *Henn* Court wrote:

> The "prima facie case" in the law of discrimination is a shorthand for the constellation of events that raises a suspicion of discrimination—enough so to require the employer to explain his conduct. When a court can identify some circumstances that "give rise to an inference of unlawful discrimination" it may treat similar circumstances as creating a presumptive case of discrimination in the future. When similar circumstances would not support an inference, they should not be treated as a prima facie case of discrimination.
>
> Retirement is an innocuous event, coming once to many employees and more than once to some. Retirement is not itself a prima facie case of age discrimination, not unless all separations from employment are. And as we have explained, an offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination. Taken together, these two events—one neutral, one beneficial to the older employee—do not support an inference of age discrimination. We agree with *Coburn* and *Diamond* that an early retirement package is a boon ...

*Henn v. National Geographic Soc.,* 819 F.2d at 828, (cites omitted).

In order for Rossi to prove that she was forced out of her employment, and forced into accepting the sick leave and donated vacation time arrangement, she must be able to show that she would have been terminated had she not chosen the arrangement. She must, at least, present evidence to "give rise to an inference of unlawful discrimination." *Henn,* 819 F.2d at 828. Instead, the undisputed evidence shows that Rossi chose to retire before further exploring her options with Amica. Consequently, the record presented to the

Court does not support any reasonable inference that she would have been fired, or suffered any other so-called "adverse employment decision."

Rossi enjoyed her ten months of full pay from Amica, using up her own accumulated sick leave, as well as the vacation time donated by Amica executives. During this period, because of her doctor's cooperation in deeming her unable to work, she also collected TDI benefits from the State of Rhode Island. Now, she would like to "undo" her retirement. *Henn,* 819 F.2d at 830. She would like to turn the clock back to March of 2001 and litigate the issue of whether she was capable of performing the essential functions of her job while toting an oxygen tank—even in the face of her physician's certification that she was disabled from performing her normal work, and also was disabled from performing work of *any* kind. Her attempts at creating factual disputes out of the situation as it existed in March of 2001 are unavailing. She chose to remain on the company payroll, collect her full salary for some ten months and then retire. During that ten-month period, she never attempted to rescind or revoke her decision to retire. She is now bound by that decision.

Plaintiff's counsel keeps insisting that she was terminated in March of 2001 despite the indisputable facts of this case. In cases where a plaintiff accepts a severance package in exchange for resignation from employment, the First Circuit looks to be sure that the plaintiff/employee made a knowing and voluntarily waiver of his or her federal civil rights, such as those workplace protections afforded by the ADA. See *Rivera–Flores v. Bristol–Myers Squibb Caribbean,* 112 F.3d 9, 10 (1st Cir. 1997); *Melanson v. Browning–Ferris Industries, Inc.,* 281 F.3d 272, 276 (1st Cir. 2002). However, those cases are not relevant to this case because here Plaintiff was

not terminated; she elected to retire and, consequently, no issue of waiver arises in this case. The long and short of it is that Plaintiff was not subjected to an adverse employment action by Amica and she cannot now attempt to "unretire" and argue moot issues that are part of the ancient history of this case. Therefore the Court grants Defendant's Motion for Summary Judgment on Count I of the Complaint.

## Count II

Count II alleges a violation of the Rhode Island Civil Rights Act of 1990, Rhode Island Gen. Laws § 42–112–1 ("RICRA"). The Rhode Island Supreme Court and this Court have consistently held that RICRA "provides broad protection against all forms of discrimination in all phases of employment." *Ward v. City of Pawtucket Police Dept.,* 639 A.2d 1379, 1381 (R.I. 1994). See also *Iacampo v. Hasbro, Inc.,* 929 F.Supp. 562, 573 (D.R.I.1996); *Wyss v. General Dynamics Corp.,* 24 F.Supp.2d 202, 211 (D.R.I.1998).

Consequently, because this Court has concluded, in analyzing her claim under the ADA, that Plaintiff has failed to provide sufficient evidence to establish that she suffered an adverse or discriminatory employment action, the Court grants Defendant's Motion for Summary Judgment on Count II, the RICRA claim.

## Count III

The Rhode Island Fair Employment Practices Act, Rhode Island Gen. Laws § 28–5–1 et seq., which unlike RICRA explicitly prohibits workplace discrimination based on disability, also requires evidence of an adverse, discriminatory employment decision. Consequently, as explained above, Defendant's Motion for Summary Judgment on Count III of the Complaint is also granted.

## Count IV

Plaintiff again alleges workplace discrimination and charges Defendant with a violation of Rhode Island General Law § 42–87–1 et seq., "Civil Rights of People with Disabilities." The language of this statute mirrors that of the federal Americans with Disabilities Act, and therefore the analysis is the same as that presented for Count I: Defendant's Motion for Summary Judgment on Count IV of the Complaint is granted.

## Count V

■ In Count V, Plaintiff alleges that Defendant violated the federal Family and Medical Leave Act, 29 U.S.C. § 2611 et seq., ("FMLA"). The FMLA provides that an eligible employee may take up to twelve weeks of unpaid leave in a year for, among other things, a serious medical condition. Plaintiff claims that Defendant retaliated against her because she was eligible for leave under the Act.

In order to state a valid claim under the FMLA, a plaintiff must plead facts showing that:

1) he or she is an eligible employee as defined by the Act;

2) the defendant is an employer as defined by the Act;

3) the plaintiff was entitled to the leave provided by the Act; and

4) plaintiff must give adequate notice to the employer of his or her intention to take such leave.

*De Hoyos v. Bristol Laboratories Corp.,* 218 F.Supp.2d 222, 224 (D.P.R.2002).

While Rossi may have been eligible for leave pursuant to the FMLA, there is no evidence presented that she ever requested a leave. The *De Hoyos* Court stated, "Where the plaintiff has an option of claiming paid sick leave or FMLA leave, the employee must make an election to be covered by the Act. . . . The Act should not

be interpreted to give every terminated employee the right to retroactively claim that his or her sick leave should be considered FMLA leave, thereby supporting a claim pursuant to the Act's non-discrimination provisions." *De Hoyos,* 218 F.Supp.2d at 226. In the present case, Rossi never requested FMLA leave and cannot now bring a claim pursuant to its provisions. Consequently, Defendant's Motion for Summary Judgment on Count V of the Complaint is granted.

## Count VI

■ In Count VI, Plaintiff charges that Defendant violated the Rhode Island Whistleblowers' Protection Act, R.I.G.L. § 28–50–1 et seq. In summary, the statute prohibits an employer from terminating, threatening, or otherwise discriminating against an employee because the employee reports, or is about to report, to a public body that the employer has violated a law, regulation or rule, or is about to do so. R.I.G.L. § 28–50–3.

Rossi claims that Amica terminated her because she complained of Amica's conduct by filing a charge with the R.I. Commission on Human Rights and the Equal Employment Opportunity Commission, and by seeking to assert her rights under the Family and Medical Leave Act.

In interpreting the Rhode Island Whistleblowers' Act, the First Circuit has held that "an employee must demonstrate that there was a causal connection between the report and the termination." *Marques v. Fitzgerald,* 99 F.3d 1, 4 (1st Cir.1996). As this Court has determined that there was no "termination," there is no cause of action under the Act in this case.

Moreover, the chronology does not support a claim under this Act. Rossi chose to retire in March 2001, when she went on oxygen and stopped working. She logged several months of sick time and donated

vacation days until her actual retirement on February 1, 2002. She filed her charge with the Commission on Human Rights in December 2001, after she had been out on paid leave for almost ten months. Without the assistance of a crystal ball or a time machine, it is a legal impossibility for Amica to have terminated Rossi in March 2001, because of her filing a report of discrimination ten months later in December 2001.

Consequently, Defendant's Motion for Summary Judgment on Count VI of the Complaint is granted.

### Count VII

In Count VII, Rossi alleges that she was terminated by Amica because of her age, in violation of the federal Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"). To make out a prima facie case of age discrimination, a plaintiff must show that 1) she was over forty years old; 2) she suffered an adverse job action; 3) her job responsibilities were assumed by another person; and 4) plaintiff was qualified to do her job and performing well enough to rule out the possibility that the termination was for inadequate performance. *Keisling v. SER–Jobs for Progress*, 19 F.3d 755, 760 (1st Cir.1994). Once the prima facie case is established, the burden then shifts to the defendant, who must present evidence that there was a legitimate, non-discriminatory reason for the adverse job action. *Keisling*, 19 F.3d at 761.

The Court has determined that there was no adverse employment action taken against Rossi. Instead she voluntarily accepted a retirement package, like the plaintiffs in *Henn v. National Geographic Society*, 819 F.2d 824. And, like the *Henn* plaintiffs, she cannot now "undo" her choice to retire. Defendant's Motion for Summary Judgment on Count VII of the Complaint is granted.

### Conclusion

For the reasons stated above, the Court grants Defendant's Motion for Summary Judgment on all Counts of Plaintiff's Complaint. The Clerk shall enter judgment for Defendant, as indicated, forthwith.

It is so ordered.